George S. **YUMICH** and Philip Steven Shear, by his father and next friend, Dr. Sidney Shear, Plaintiffs-Appellants,

v.

John E. **COTTER** et al., Defendants-Appellees.

No. 18397.

United States Court of Appeals, Seventh Circuit.

Oct. 13, 1971.

Rehearing Denied Nov. 29, 1971.

Pell, Circuit Judge, dissented and filed opinion.

Richard F. Watt, Chicago, Ill., for plaintiffs-appellants.

Peter Fitzpatrick, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Chief Judge, and FAIRCHILD and PELL, Circuit Judges.

FAIRCHILD, Circuit Judge.

This action concerns events which occurred on the fifteenth floor of the Conrad Hilton Hotel in Chicago just after the close of the 1968 Democratic National Convention. Senator Eugene McCarthy, of Minnesota, had sought the nomination for President, and the fifteenth floor was one of two assigned to his campaign committee. The convention closed Thursday evening, August

29. A number of campaign workers remained in the McCarthy headquarters area on the fifteenth floor into the early morning hours of August 30. About 5 a. m., apparently at the request of hotel employees, fifteen or more city police officers cleared the fifteenth floor and required the occupants to take elevators down to the main lobby. The two plaintiffs, George Yumich and Philip Shear, claim that police officers struck and injured them wilfully and without cause during the eviction.

Yumich is a college textbook editor for a publishing company in New York. In the summer of 1968, he was at first a volunteer worker for McCarthy and later a compensated advance press aide. Shear, who brought suit by his father, was a high school student in California, aged 16, and a volunteer worker, beginning in January, 1968. During the convention he had the assignment of checking the credentials of persons coming to the 15th floor.

The defendants were fifteen Chicago police officers, two hotel employees, the city of Chicago, and Hilton Hotels Corporation.

Count I of the complaint was a civil rights claim, based on 42 U.S.C. § 1983, and directed at all defendants. Count III was a claim under Illinois law against all defendants, in substance for assault. Count V was directed at the hotel and its employees and was a state law claim that they violated duties as innkeepers to guests and licensees. Jurisdiction as to Counts III and V was based on diversity. Other counts were withdrawn.

The district court dismissed Count I against the city because it is a municipal corporation. Plaintiffs argue that this was error.

At the end of plaintiffs' case in chief, no individual defendant had been identi-

fied as an assailant. The district court dismissed all counts against individual defendants and dismissed Count I entirely. The jury returned a verdict on Counts III and V in favor of both defendants. Plaintiffs have appealed, but seek reversal as to the city alone.

The first question argued by plaintiffs is whether the district court properly dismissed the civil rights claim for damages against the city. It is not clear, under the circumstances, how a reversal of this ruling would improve their position. If the allegation of unlawful acts of the police officers could give rise to a § 1983 claim against the city, the verdict on the state law tort claim issues established that in fact the police officers' acts were not unlawful. If the verdict be reversed for error, we see no reason why the existence of a civil rights claim against the city would give plaintiffs any advantage at a new trial. Moreover, in the state law tort claim, plaintiffs have the advantage of being able to rely on *respondeat superior*.

█ In any event, in Monroe v. Pape (1961), 365 U.S. 167, 192, 81 S.Ct. 473, 5 L.Ed.2d 492, the Supreme Court held that a similar type of complaint against the city was properly dismissed, saying that Congress did not intend the word "person" subjected to liability by 42 U. S.C. § 1983 to include a municipality. Whatever may be the rationale for joining municipalities in § 1983 suits for injunction or declaratory judgment, usually along with individual officers and board members,[1] we consider that *Monroe* conclusively established that a city was not made liable for damages by § 1983.

Plaintiffs point out that under present Illinois law a "city is not immune from liability arising from tortious acts of police officers in the scope of their employment,"[2] and that in civil

1. See Monroe, p. 191, footnote 50, 81 S.Ct. 473; Tinker v. Des Moines Independent Community School District (1969), 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; Lee v. Board of Regents, 441 F.2d 1257 (7th Cir., 1971); Schnell v. City of Chi-

cago (7th Cir., 1969), 407 F.2d 1084, 1086; Adams v. City of Park Ridge (7th Cir., 1961), 293 F.2d 585.

2. Andrews v. City of Chicago (1967), 37 Ill.2d 309, 226 N.E.2d 597, 598.

rights cases 42 U.S.C. § 1988 requires federal courts to apply state law in the trial and disposition of the case if federal laws are not adapted to the object or do not furnish suitable remedies.

Plaintiffs have called to our attention the recent decision of Carter v. Carlson, 447 F.2d 358, p. 369 (July 23, 1971, No. 23,225) holding, as one of several reasons why the District of Columbia might be liable under § 1983, that *Monroe* "held only that § 1983 does not authorize a suit for damages against a municipality which has been clothed in immunity by its parent state." With all respect, however, we read *Monroe* as a binding statutory construction, not dependent upon state law immunity, and not related to a deficiency in federal remedies, but establishing that § 1983 does not impose liability for damages upon a city.[2a]

Plaintiffs seek a new trial of Count III, the tort claim, against the city on account of the admission of a particular line of testimony and the court's refusal to give a requested missing witness instruction. Consideration of these arguments requires a review of the facts.

There were conflicts in testimony on some points. Mindful that the evidence is to be viewed in the light most favorable to supporting the verdict, and thus in this case to the defendants, we summarize the facts as follows:

The alleged assaults occurred in the elevator lobby at the center of the 15th floor of the hotel. Background events occurred in Room 1506A and the corridors connecting that room with the elevator lobby. There is testimony concerning eviction of occupants of two other rooms.

Room 1506A and connecting Room 1505A have three windows facing east onto Michigan Avenue. The rooms are at the end of an east-west corridor about 50–60 feet long. A north-south corridor intersects the east-west corridor at its west end. The north-south corridor leads into the east end of the elevator lobby about 20 feet south of the intersection. The dimensions of the elevator lobby are about 45 feet east to west and 25 feet north to south.

A party where a considerable quantity of beer and liquor was consumed took place in 1506A. It was in progress at 1:30 a. m. and continued until terminated by the hotel management and police about 5 a. m. People threw beer cans, ash trays, and other objects out of the window from time to time. These objects fell to the sidewalk just north of the hotel entrance. Members of the Illinois National Guard were stationed along the east side of the hotel because of conditions in Chicago at that time. Officers were concerned about danger from the falling articles and, with the help of two hotel employees, identified Room 1506A as the source.

About 5 a. m., after a conference between hotel employees and police officers, defendant Anderson, a hotel employee, and defendant Gilbride, a police lieutenant, went to the 15th floor, accompanied by two plain clothes policemen, one or two uniformed policemen, and another hotel employee. They went to Room 1506A and talked with the people there. At the time there were a number of people, 25 or more, in the elevator lobby and corridors, and about 20 in 1506A. The door to 1506A was open and there was evidence that people came and went and that there was drinking and other social activity among people in the corridors.

After a message was sent down to defendant Matthews, night manager of the hotel, instructions came back to send any registered guests to their rooms and all others to the main lobby. Other groups of police officers and four National Guardsmen came up. Fifteen to 20 police officers were on the 15th floor.

Anderson told the people in 1506A they must leave. Although at first several argued and refused, there was no physical resistance and all left to go to

---

**2a.** Ries v. Lynskey, 452 F.2d 172 (7th Cir., 1971).

the elevator lobby. The police told all the people to take elevators down to the main lobby. Some went quietly and some argued that they should be allowed to go to the 23rd floor where Senator McCarthy and other campaign workers were. Three exhorted others to go up and not down. There was testimony that some unidentified individuals resisted efforts of the police to get them on elevators. None of this testimony related to any physical resistance offered by plaintiff Shear, and, with one possible exception, none related to physical resistance by plaintiff Yumich. Defense witnesses indicated generally that the police were patient and used only minimal force when force was used.

There was considerable testimony about an attempt by John Warren, one of the campaign workers, to strike police officer Eraci with a table. Eraci defended himself and temporarily disabled Warren by a blow on the head with a baton. John Warren had originally been a plaintiff in this action, but had withdrawn before trial. The Warren incident occurred in the northeast portion of the elevator lobby. Detective Nolan, in plain clothes, had been standing near the southeast corner of the elevator lobby. He went toward Eraci, to aid him, but was sprayed in the face with an eye irritant. After first aid, he left the scene. No witness claimed to have observed the person who sprayed Nolan. One or more officers sprayed one or more of the campaign workers with mace.

The alleged assault on plaintiff Yumich occurred a split second before the Warren incident, and Nolan was the only defense witness who gave any testimony which could have been related to the Yumich incident.

Yumich had been in 1506A while Gilbride was there. He testified that after he went to the elevator lobby, he asked a police officer to allow him to go to the 23rd floor; that after permission was denied, the officer struck him in the chest with a nightstick, propelling him backwards; that two officers grabbed him, one on each side, and someone behind him struck him on the head and shoulders. His testimony was corroborated by campaign workers Axelrod, Holmberg, Yarrow, Richard Warren, and, in part, Cohen. The fact that he had a 1½ to 2 inch scalp laceration was established by the deposition of the doctor who gave first aid, and the emergency room record of the hospital where five sutures were inserted abut 8 a. m. August 30.

Detective Nolan testified that just before the Warren incident he saw a man near the southwest corner of the elevator lobby start to swing his fist at a uniformed police officer. The officer warded off the blow by holding his club in both hands and hitting the assailant's chest. The time, place, and blow on the chest are consistent with the man being Yumich, but Nolan did not identify him, nor see the blow on his head. Nolan was unable to identify the officer at whom the swing was aimed.

The only other police officers who testified were Eraci, Rothgery, Gilbride, and Cotter. Eraci had seen Yumich in 1506A and thought he was intoxicated, but did not see anyone hit him. Rothgery, Gilbride, and Cotter did not recall seeing Yumich. The two National Guard officers who had been present and testified did not describe an incident similar to that described by either Yumich or Nolan.

Steven Shear, aged 17 at the time of trial, testified that he had gone to sleep at 1:30 or 2 a. m. on the floor of Room 1502. This was a room near the southeast corner of the elevator lobby. It had been used as a meeting room during the week. He had a pillow and had removed his jacket and shoes. On previous nights he had been assigned to a hospitality suite on the second floor as a sort of night watchman and had slept there. One of his co-workers told him he could sleep in 1502 the night in question. He testified he had nothing to drink. About 5 a. m. he was awakened by being pulled to his feet by three police officers who said he had no right to be in the room. He was pushed and pulled into

the elevator lobby without his shoes on. He said he was standing in the east end of the elevator lobby when he was struck from behind with a sharp object, across his back near his neck, and knocked to the floor. Three policemen were near him. Whoever hit him was standing behind him. The doctor who gave first aid testified that he observed a "welt over the shoulder and back of the neck." The emergency room record shows the finding: "contusion over back of neck C-6 & just below point of R scapular."

No other witness described the Shear incident. The police officers testified that they did not recall seeing Shear and that they did not enter nor see other officers enter any rooms other than 1506A. Captain Cotter, in command, testified that he did not direct entry of other rooms. One campaign worker, Richard Warren, testified that he was sleeping on the floor in Room 1511 (also near the southeast corner of the elevator lobby) and was evicted by police officers.

In order to reach the verdict against Yumich, the jury would have had to find circumstances justifying the forceful eviction of those in his position. It could scarely have found that he did not receive an injury from a blow on his head. Thus it would have to have found that that degree of force was not unnecessary. To do so, it would have had to disbelieve the witnesses who testified that Yumich offered no resistance, to find from Nolan's testimony that it was Yumich who swung his fist at an officer, and to infer that the threat reasonably made it necessary to strike him in the chest and on the head.[3]

It is more difficult to hypothesize a proper course of reasoning leading to the verdict against Shear. Justification of his eviction must rest either on a determination that under the arrangement made with the hotel for convention space, unregistered campaign workers had no right to occupy a meeting room like 1502 as a sleeping room, or disbelief that he was there and evicted by the police. There is no testimony of any resistance by him. He was unable to say what or who had hit him, and a verdict would have to rest on his failure as plaintiff to persuade the jury that the blow came from a police club rather than from some other source for which the police could not be held responsible.

Plaintiffs have not argued that the verdict is unsupported. We are not prepared to say that the verdict will so clearly result in a miscarriage of justice that this is one of the exceptional cases in which a federal appellate court can properly reverse and order a new trial on that ground.[4] In assessing plaintiffs' claims of reversible error, however, we are mindful of the obvious danger of prejudice against these plaintiffs inherent in the background circumstances, the paucity of direct evidence to refute their claims, the danger of an inflammatory, guilt-by-association, effect from the evidence concerning the objects dropped from 1506A, as well as the lack of testimony from the police officers who seem most likely to have been in a position to observe relevant facts. It seems virtually incredible, in view of the fact that the events took place in an area the size of an elevator lobby and of the substantial number of police officers present, that the two or more officers who participated in the Yumich incident were unable to remember it and that no other officer except Nolan observed and recalled it.

---

3. Counsel for the city conceded, in argument to the jury, that somebody behind Yumich "tapped him." He argued, however, "Well, I don't like to quote Al Capone as an authority but maybe— maybe he could teach philosophy at Berkeley, but Al Capone used to say, after somebody was found dead, 'They don't kill you for nuttin.' And you don't get rapped on the head for nothing."

4. See Aetna Casualty & Surety Co. v. Yeatts (4th Cir., 1941), 122 F.2d 350, 354; Charles v. Norfolk & Western Ry. Co. (7th Cir., 1951), 188 F.2d 691, 695; Shupe v. New York Central System (7th Cir., 1965), 339 F.2d 998, 1002.

Plaintiffs contend that the court erred in refusing to give an instruction permitting an inference, under certain circumstances, that the testimony of a witness available to and under the control of a party, but not called by him, would have given testimony adverse to that party. Plaintiffs point out that only five out of fifteen to twenty police officers present in the elevator lobby were called by the defendants.

The trial judge at first indicated his view that plaintiffs were entitled to the instruction. When told by the city's counsel that all the officers had been present at trial and available, the trial court decided that the officers were equally available to plaintiffs and refused the instruction. In this we think the court erred.

It has been held that where there is likelihood of bias on the part of the person not called as a witness in favor of one party, "that person is not, in a true sense, 'equally available' to both parties; and, except in unusual circumstances, a party's employees come within that category."[5] Here the police officers were not only the employees of the city, but had a strong personal interest in the success of the city's defense of their conduct on the occasion in question.

The city points out that it had given plaintiffs the statements of the officers and that plaintiffs had taken their depositions. The city has cited Illinois cases where it was decided that a missing witness instruction was properly refused and where the court noted that the party requesting the instruction might properly have called the person as an adverse witness without being bound by his testimony.[6] We do not consider ourselves bound by the state rule on that subject in a diversity case.

Plaintiffs' counsel, however, had the opportunity to comment in oral argument to the jury upon the absence of testimony from police officers, refuting plaintiffs' version. Counsel repeatedly pointed this out and argued that if Yumich had really given cause to be struck on the head, such testimony would have come out. The majority of the court are of the opinion that since plaintiffs were permitted to comment in this fashion, it was not reversible error to refuse the missing witness instruction. The author of this opinion, however, individually holds the view that in the circumstances of this case it was an abuse of discretion to withhold the support which the instruction would have given to this line of argument.

Plaintiffs further contend that the testimony of a number of witnesses about the objects dropped from the windows of 1506A was irrelevant. They argue that this evidence was "highly prejudicial since it clearly would tend to create in the minds of the jurors the impression that Plaintiffs were in some way connected with these allegedly illegal and dangerous acts, or at the very least were associated with some very undesirable people who were doing these acts." That there was palpable danger of improper reaction by jurors to these circumstances is evident.

At trial, plaintiffs sought an order requiring defendants not to offer evidence that objects were thrown from windows. Plaintiffs correctly asserted that no evidence connected them with the throwing of such objects, and they stated that "Plaintiffs do not contend that the entry into, or clearing of, Room 1506A was unlawful."

We cannot say that evidence along these lines was wholly irrelevant. The alleged assaults occurred in the course of the eviction of plaintiffs and other people from the 15th floor, and plaintiffs' concession did not go quite so far as to say that plaintiffs were not challenging the propriety of that eviction.

---

5. United States v. Beekman (2d Cir., 1946), 155 F.2d 580, 584.

6. In re McVicker's Estate (1963), 39 Ill. App.2d 389, 188 N.E.2d 731, and Pawlowic v. Pearce (1965), 59 Ill.App.2d 153, 207 N.E.2d 155.

Nevertheless the real, central issue at trial was whether the force used on Yumich and allegedly on Shear was excessive, and not whether the eviction was proper. Although defendants were probably entitled to show the background facts to some reasonable extent, we think that the great tendency toward prejudice inherent in this evidence imposed a duty on the trial court to keep it within much closer bounds.

Defendants followed the strategy of laying great emphasis upon the areas of evidence in which they could make the most favorable showing, but which were least relevant to the real issue and most likely to have an inflammatory effect, i. e., the foolish, dangerous activity in which some of the people on the 15th floor had indulged, and which produced the entry of the police, and the activity of John Warren, no longer a plaintiff, which apparently justified the blow on his head. It appears that the officers who were not involved in or close to the John Warren incident would have been more likely to have observed the incidents involving Yumich and Shear.

The first six witnesses for the defense were National Guard officers. Three of them were never on the 15th floor and testified only concerning the dropping of objects into the street. Lt. Conroy testified that he had observed a ¾ inch ball bearing which dented the hood of a jeep, a can of beer which exploded when it hit the sidewalk, and a glass object. He described how a sniper team located the window from which things were thrown. Col. Strupp testified about objects thrown from the window. "There were beer cans, there were ball bearings, there were broken ashtrays, there were broken glasses; there were beer cans full of human waste, there were some beer cans which I believe had urine in them. There were some items there that really could have killed somebody if they hit somebody." He also described how the window was located. Major Brown testified that he saw glass and beer cans strike the ground near the troops and that the troops were ordered back against the building. He also described the process of location.

Col. Tress did get to the 15th floor and testified concerning matters there. He also testified concerning broken ashtrays, a steel ball bearing, beer cans partially filled with liquid, falling to the street, and the process of locating the window. Dr. Glatter, battalion surgeon, testified in part about matters on the 15th floor, and also described similar objects which had fallen and the process of location.

The sixth guardsman witness was Mr. Ochsenschlager. When he was called the court suggested that his testimony would be cumulative, and he was examined only as to his observations on the 15th floor. John Warren was later called by defendants and admitted he had seen one or more beer cans dropped out the window. A hotel bellman, Costanzo, testified, among other things, that he had looked into 1506A and seen 3 or 4 people throwing beer cans and ashtrays out the window, handed them by others.

Considering all the circumstances, and granting that a very limited amount of testimony concerning the facts which brought the police to the 15th floor may have been appropriate, we think that the emphasis on the revolting conduct of the people who dropped objects out of the window deprived plaintiffs of a fair trial of the real issue in the case, whether the force used on Yumich and Shear was excessive.

The judgment is reversed and cause remanded for a new trial.

PELL, Circuit Judge (dissenting).

I must respectfully dissent. I would affirm the judgment below.

The majority opinion of the court seems to be predicated on the feeling that the trial did not come off quite fairly to the plaintiffs. Yet it is conceded on the elements involved that (a) the verdict was supported and was not

66

so clearly a miscarriage of justice as to make that ground per se cause for reversal; (b) the refusal to give the tendered instruction on missing witnesses was not reversible error and (c) the defendants were properly entitled to show as background facts the lawless activity being conducted for a substantial period of time in the immediate locale of the plaintiffs.

In final analysis, it seems we are sending this case back for a new trial because the trial judge is found to have failed to impose quite soon enough a curb on the extent of evidence admittedly admissible to some extent. This seems to be a matter of judicial discretionary judgment and on the record before us I do not think we should fault the judge on the basis that the particular evidence should have been cut off at an earlier point which in our retrospective judgment we now think was the desirable terminal point.

Since the evidence was admissible initially, if only one witness had testified to the orgy of spewing of items from the fifteenth floor of the hotel, the jury would have been aware of what had transpired and the defendants would have been entitled to a full exposition of these background facts on final argument.

I concede that evidence, as well as instructions, may be prejudicially repetitive but I think that a reversal should only result from the admission of corroborative evidence when the trial judge's discretion has been more clearly abused than it has been here.

The corroboration has an additional significant aspect here. The trier of fact should not be required to consider police action in a vacuum but rather in the context in which it was exercised, here that of senseless lawlessness. It seems to me that the additional testimony served to establish that it could have been no secret to the plaintiffs that they were present, if not themselves participants, at activities designed to precipitate law enforcement appropriate to the disturbance. The measure of that disturbance and its obviousness to the plaintiffs is found in the testimony which the district court permitted in evidence.

The only countervailing argument presently occurring to me on the basis of the extent of the activity is that it might have been thought by the plaintiffs that it was of such magnitude and that since nothing had been done about it by 5 o'clock in the morning, possibly the police had abandoned any effort to curb lawless activity.

With regard to the matter of the missing witnesses instruction I find a very astute analysis of this matter in McCormick, Law of Evidence § 249, p. 533 et seq.

In my opinion the conclusion of Professor McCormick (at p. 536) is correct that even though the failure to call an available witness may be argued, it should not be the basis of an instruction as a matter of right. Here the city had furnished copies of the statements of the police officers taken by the Corporation Counsel and the plaintiffs had taken the deposition of each of the policemen and examined them in detail. In my opinion, the instruction was properly refused.

For the reasons hereinbefore set out, I would affirm the judgment.