In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-1634

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MATTHEW CHRIST,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 1093—**John W. Darrah**, *Judge.*

_____

ARGUED SEPTEMBER 26, 2007—DECIDED JANUARY 28, 2008

_____

Before MANION, EVANS, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* From 1999 until 2001, Matthew
Christ served as a consular officer at the American Em-
bassy in Vilnius, Lithuania. A jury convicted Christ of one
count of conspiring to commit visa fraud, finding that he
used that position to fraudulently facilitate the issuance of
visas to certain Lithuanian citizens. Christ appeals, argu-
ing that there was insufficient evidence to support his
conviction, and that the district court abused its discre-
tion in admitting certain evidence and testimony. Christ
asserts that the district court further erred by failing to
give a missing witness instruction, and that it relied on

improper facts in enhancing his offense level at sentencing, thereby rendering his sentence unreasonable. We affirm Christ's conviction and sentence.

## I.

On March 23, 2006, Matthew Christ was charged in a Fourth Superseding Indictment ("Indictment") with two counts of conspiracy to commit visa fraud in violation of 18 U.S.C. §§ 371 and 1546 and one count of bribery in violation of 18 U.S.C. § 201(b)(2)(A). Prior to trial, the government dismissed one of the visa fraud counts. The case proceeded to trial on October 23, 2006, and the jury was presented with evidence of the following. Christ is a graduate of the United States Military Academy in West Point, New York. After more than a decade of active service in the United States Army, he became a Foreign Service Officer with the Department of State and was assigned to the American Embassy in Vilnius, Lithuania. Christ held this position from August 1999 until July 2001, during which time he was authorized to adjudicate visa applications and submit favorable referrals. A visa is a document issued to a non-citizen signifying that the holder was screened by a consular officer who determined that there is no reason to deny travel to the United States. In making this determination, consular officers consider the applicant's credibility and criminal background, as well as indicia that the applicant will return from the United States after his visit. While an interview is normally required as part of this review process, rules in place during the period in question allowed consular officers to waive the interview for individual applicants or categories of applicants considered low risks for visa

violations.[1] The interview requirement could also be waived if an application was accompanied by a document known as a Class A referral ("referral"). A referral is a form submitted by a consular officer stating that the applicant is well and favorably known to the officer, and that expeditious processing of the application is in the national interest of the United States. According to a State Department memo introduced at trial, referrals are appropriately submitted on behalf of influential persons in government, business, science, and academia, or other persons able to enhance diplomatic relations. After this review process, the visa application is adjudicated, meaning that the final decision to grant or deny the visa is made.

The government charged that Christ engaged in the visa fraud conspiracy with four Lithuanians, Aivaras Grigaitis ("Aivaras"), his brother Robertas Grigaitis ("Robertas"), Mindaugas Masiliunas ("Masiliunas"), and Valdas Stauga ("Stauga"). As a hobby, Aivaras restored antique motorcycles, which he then sold. After placing a newspaper advertisement for the sale of a restored motorcycle, Aivaras was contacted by Christ, who is an admirer and collector of antique motorcycles. After meeting at Aivaras's shop, Christ purchased the advertised motorcycle, and Aivaras delivered it to his home. During this transaction, Aivaras learned of Christ's employment at the Embassy. Aivaras and his brother Robertas desired to live in the United States because of the poor economic situation in Lithuania at the time, and the two speculated that Christ's employ-

---

[1] Karen Christensen, a division chief with the Bureau of Consular Affairs at the State Department, testified that following the terrorist attacks of September 11, 2001, rule changes were effected requiring that every visa applicant, without exception, be interviewed.

ment at the Embassy might combine with his interest in motorcycles to make him a helpful resource in obtaining visas. Subsequently, Aivaras invited Christ back to his shop to see another motorcycle he had restored. After Christ expressed interest, Aivaras offered it to him in exchange for help in obtaining visas. Aivaras testified that Christ agreed to the offer. Christ told Aivaras that in order to apply for visas he and Robertas needed passports, photos, and application fees. When Aivaras asked if they should bring these items to the Embassy, Christ responded that he would instead come to Aivaras's shop after business hours.

Christ arrived at Aivaras's shop on the designated evening with blank applications, which the Grigaitis brothers then completed in his presence. On Christ's advice, Robertas stated on his application that he intended to travel to the United States for tourism, although he testified at trial that he also intended to find employment here. Because Aivaras's passport was missing, he was unable to complete an application in his name. He instead completed one for Masiliunas, a friend of his, stating on Christ's advice that Masiliunas's purpose for traveling to the United States was tourism. Upon completing the application, Aivaras signed it in Masiliunas's name. Christ took the applications back to the Embassy, and adjudicated Robertas's application in November 1999, and Masiliunas's application in December 1999. Ruta Kundrotiene, a visa assistant at the Lithuanian Embassy responsible for processing applications, testified that each man was issued a ten-year visa allowing periodic travel to the United States.

When Christ delivered these visas to Aivaras, Aivaras requested additional assistance in obtaining a visa for

himself, as well as Stauga, his neighbor. Christ agreed and subsequently returned to Aivaras's shop with blank applications. Aivaras completed his application, as well as Stauga's, in Christ's presence. Instead of personally adjudicating this second pair of visas, Christ submitted each application with a referral. While the government did not present the referral forms themselves at trial, there was evidence of Christ's conduct in the form of a handwritten notation on each application stating, "Referred by Matt Christ." In March 2000, Aivaras and Stauga were issued visas of the same sort previously issued to Robertas and Masiliunas. Kundrotiene testified that Christ's referrals allowed Aivaras and Stauga to receive visas without being interviewed. Aivaras testified that after the four visas were issued, he delivered the agreed-upon motorcycle to Christ's house, and Christ never paid, nor offered to pay, for it.

In November 2000, Aivaras again contacted Christ and requested his assistance in obtaining visas for Robertas's wife and two children. Aivaras told Christ that he was restoring additional motorcycles he could offer Christ in exchange for his help. Aivaras testified that Christ agreed, and Robertas subsequently contacted him. The two arranged to meet at a gas station, and Robertas arrived with completed applications he had obtained for his family, as well as their passports. Christ submitted these applications in February 2001 with referrals. The referral forms, which were introduced at trial, stated that the applicants were well and favorably known to Christ and that expeditious processing of the applications was in the national interest of the United States. Robertas testified, however, that no one in his family had ever met Christ. Notwithstanding Christ's referrals, the visa assistant

processing the applications determined that Robertas's family should be interviewed because Robertas's visa had been so recently issued. The family was directed to appear with, among other documents, Robertas's passport, which would allow consular officers to determine whether he had traveled to the United States, and if so, whether he had returned to Lithuania. When Robertas's family failed to arrive for their interview with the requested documents, their applications were denied. These events surrounding the family applications resulted in an investigation of visa fraud at the Vilnius Embassy, leading ultimately to Christ's indictment and arrest.

In addition to the above, the jury heard testimony regarding Christ's financial transactions and motorcycle interests around the time he received the second motorcycle from Aivaras. Roland Slabon, president of a group known as Vintage BMW Motorcycle Owners, testified that Christ contacted him in the Fall of 1999 inquiring about certain types of antique BMW motorcycles, and expressing interest in purchasing some that he had come across in local markets. Additionally, Charles Christ, the defendant's father, testified that he had a telephone conversation with his son in February 2000 during which Christ stated his intent to purchase a BMW motorcycle for $1,000 in the coming weeks. Finally, an auditor with the United States Attorney's Office testified regarding checks cashed by Christ at the Lithuanian Embassy between August 1, 1999, and September 28, 2001. While Christ cashed checks for amounts ranging from $200.00 to $630.00 during that period, the jury's attention was directed to two separate checks each for $500.00 cashed three days apart in early February 2000. The defense argued in closing that these checks corroborated

the testimony of Charles Christ, and that the testimony, taken as a whole, showed that Christ did not receive the second motorcycle as a bribe from Aivaras, but rather purchased it. The defense further argued that if the jury found that Christ purchased that motorcycle, it followed that he had no motive to engage in a conspiracy to commit visa fraud, and the evidence was therefore insufficient to convict him of that charge.

On November 1, 2006, the jury returned a verdict of guilty on the visa fraud charge, and not guilty on the bribery charge. Thereafter, Christ moved for a judgment of acquittal, or alternatively, for a new trial. In arguing for a judgment of acquittal, Christ argued that insufficient evidence was presented to establish his guilt beyond a reasonable doubt. His motion for a new trial was also based on the insufficiency of the evidence, as well as his argument that the district court's admission of certain evidence and failure to properly instruct the jury deprived him of a fair trial. Specifically, Christ argued that the district court should not have admitted the evidence involving Robertas's family because it amounted to evidence of an uncharged conspiracy not intricately intertwined with, or undertaken in furtherance of, the charged conspiracy. Next, Christ argued that his trial was unfair because the referral notations on Aivaras's and Stauga's applications were inadmissible hearsay. Christ also argued that the court should not have allowed the government to question Roland Slabon regarding Christ's payment to him of witness fees. Finally, Christ argued that his trial was rendered unfair by the district court's failure to give a missing witness instruction after the government failed to call certain consular officials. Christ's motion was denied by the district court on Febru-

ary 21, 2007. The district court proceeded to sentencing on March 1, 2007, at which point it determined Christ's Guideline range to be twenty-one to twenty-seven months. This range was arrived at, in part, by including the family visa applications in Christ's relevant conduct. Christ was sentenced to twenty-four months in prison. He now appeals his conviction based upon the same grounds as his post-trial motion. Additionally, he argues that his sentence was unreasonable because the district court had no basis to find that Christ's crime involved more than the four visas procured for the co-conspirators.

## II.

We begin with Christ's evidentiary challenges. First, Christ argues that the district court erred in admitting the evidence related to the family visa applications that were rejected when Robertas's family failed to show up for their interview with the requested documents. He asserts that the evidence was irrelevant, and not undertaken in furtherance of, or intricately related to, the charged conspiracy. The district court admitted the evidence primarily under the theory that it was intricately related to the conspiracy, and therefore admissible to explain fully the circumstances related to the charged crime. *See United States v. Thompson*, 286 F.3d 950, 968 (7th Cir. 2002) ("Evidence that is so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime is excluded from Federal Rule of Evidence 404(b)'s prohibition against other acts evidence admitted to show action in conformity therewith and, therefore, may be admitted at trial.") (internal quotation omitted). Additionally, the district court noted that its finding was sup-

ported by the fact that the conduct surrounding the family applications was charged in the Indictment, and alleged to have occurred in furtherance of the charged conspiracy. We review the district court's decision to admit this evidence for abuse of discretion. *United States v. Hale*, 448 F.3d 971, 985 (7th Cir. 2006).

Christ argues that the district court abused its discretion in admitting this evidence because the charged conspiracy only involved Christ's procurement of visas for the four co-conspirators. Specifically, Christ relies on paragraph 4 of the Indictment which charged:

> It was part of the conspiracy that defendant CHRIST, together with Aivaras Grigaitis, Robertas G., Mindaugas M., and Valdas S., gave and caused to be given something of value to CHRIST to induce him to commit and omit acts in violation of his official duties as a Foreign Service Officer for the Department of State and to facilitate the commission of other criminal offenses, such as immigration fraud and identification document fraud, in that they agreed to provide a vintage BMW motorcycle directly to CHRIST, *to cause the issuance of non-immigrant visas to the United States to Grigaitis, Robertas G., Mindaugas M., and Valdas S*.

(Emphasis added.) While Christ argues that this language, and particularly the emphasized phrase, establishes that the charged conspiracy consisted only of the conduct surrounding the issuance of visas to the four co-conspirators, we find that his interpretation relies on an overly narrow reading of this paragraph resulting from its being taken out of context. By alleging that part of Christ's role in the conspiracy was to procure visas for the four co-conspirators in exchange for a motorcycle, the govern-

ment in no way limited the charged conspiracy to that
conduct.

That the charges are broader than Christ argues is
plainly seen when the Indictment is considered in its
entirety. First, paragraph 3 of the Indictment charged that
Christ engaged in a conspiracy that continued "to at least
February 8, 2001." Aivaras's and Stauga's visas were the
second two of the co-conspirator visas issued, and such
issuance occurred in March 2000. The family applica-
tions, however, were submitted with Christ's referrals
on February 8, 2001, making clear that the government
intended to include that conduct in the charges set forth in
the Indictment. Next, the Indictment charged that Christ
and the four co-conspirators entered into an agreement and
engaged in conduct to "use, obtain, and receive . . . non-
immigrant visas, knowing them to have been procured
by means of materially false claims and statements."
This language does not limit the agreement and conduct
of Christ and his co-conspirators to the procurement of
the co-conspirators' visas, but alleges generally that they
were acting to obtain visas by fraudulent means. In fact,
when the Indictment listed the overt acts undertaken in
furtherance of the conspiracy, no less than five paragraphs
were devoted to setting forth the conduct surrounding
the family applications. The district court did not need to
resort to an "intricately related" analysis because, as the
government argued to the district court before trial,
"[n]othing could be more intricately related and inter-
twined than an allegation that is brought as a charge by
the government." *See United States v. Elizondo*, 920 F.2d
1308, 1319 (7th Cir. 1990) (noting that "[e]vidence of overt
acts which occurred after a conspiracy was formed and
which were related to the object of the conspiracy is

admissible regardless of whether [they] are charged in the indictment."). Here, Christ's conduct regarding the family visas was charged in the Indictment. Based on these circumstances, we conclude that the district court did not abuse its discretion in admitting evidence of the family visa applications.

Christ next argues that the district court abused its discretion in admitting over his hearsay objection the applications of Aivaras and Stauga, which contained handwritten notations indicating that the applicants were "Referred by Matt Christ." Visa Assistant Ruta Kundrotiene testified that these notations were made by Foreign Service Officer and then Chief of the Consular Section, Linda Eichblatt. Unlike the applications of Robertas's family, which contained similar notations but were presented at trial with attached referral forms executed by Christ, Aivaras's and Stauga's applications had no accompanying documentation verifying Christ's referrals. This absence, argues Christ, makes the reference notation inherently unreliable because there was no evidence establishing whether, or how, Eichblatt received that information. The government argues that the documents were properly admitted as business records because they were authenticated by Kundrotiene. Specifically, the government relies on Kundrotiene's testimony that she recognized Eichblatt's handwriting, that in the normal course of business Eichblatt recorded referrals on the application contemporaneous with her review of the same, and that it was the normal course of business at the Embassy to discard a referral once noted. As with the family application evidence, we review the district court's admission of the applications for abuse of discretion. *Hale*, 448 F.3d at 985.

While the admission of business records as an exception to the hearsay rule is well established, *see* Fed. R. Evid. 803(6), "statements made by third parties in an otherwise admissible business record cannot properly be admitted for their truth unless they can be shown independently to fall within a recognized hearsay exception." *Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000). Accordingly, the referral notations on Aivaras's and Stauga's applications must have their own independent grounds for admissibility. The parties agree that the district court admitted the notations pursuant to the business records exception, which requires the government to "lay a proper foundation establishing that the documents produced were records kept in the course of regularly-conducted activity and that 'it was the regular practice of that business to make [the document] as shown by the testimony of the custodian *or other qualified witness*.'" *United States v. Lawrence*, 934 F.2d 868, 870 (7th Cir. 1991) (quoting Fed. R. Civ. P. 803(6) (emphasis added)). This exception, therefore, "clearly does not require that the witness have personal knowledge of the entries in the records. The witness need only have knowledge of the procedures under which the records were created." *United States v. Wables*, 731 F.2d 440, 449 (7th Cir. 1984).

Kundrotiene testified that as a Visa Assistant, she received applications, entered the information contained therein into the Embassy's data system, and then passed the applications on for adjudication. Once an officer such as Eichblatt received the application for processing, Kundrotiene testified that the presence of any referral was noted on the application, and the referral was then discarded. Kundrotiene stated that an accompanying referral, signed by a qualified officer, was the only reason

such a notation was made, and that it was against policy for an officer to make this notation without the requisite referral. Kundrotiene stated she had no specific memory of the notations being made on Aivaras's and Stauga's applications. However, she stated she was confident testifying to the process by which such notations were made because of what she knew Embassy policy to be, and because she worked in close physical proximity to Eichblatt, which allowed Kundrotiene to observe her practices. Finally, Kundrotiene testified that she was able to identify the handwritten notations as being made by Eichblatt because she recognized Eichblatt's handwriting. In addition to Kundrotiene's testimony, the government presented the three applications of Robertas's family members. These applications, which were introduced with the referrals signed by Christ, had notations similar to those on Aivaras's and Stauga's applications, even though the latter were introduced at trial without signed referrals. This evidence, taken as a whole, provided the district court with sufficient grounds upon which to find that Kundrotiene exhibited knowledge of the practices and procedures that resulted in the referral notations being made on Aivaras's and Stauga's applications. Kundrotiene laid the foundation establishing the reliability of the notations, and that reliability was confirmed by similar notations present on the applications of Robertas's family. Accordingly, we conclude that the district court did not abuse its discretion in admitting the applications of Aivaras and Stauga in their entirety.

Having concluded that the district court did not err by admitting the evidence above, we turn to Christ's argument that the government presented insufficient evidence to support his conviction, and that the district court

should have granted him a judgment of acquittal. We review the district court's decision denying a judgment of acquittal de novo. *United States v. Jones*, 222 F.3d 349, 351 (7th Cir. 2000) (citation omitted). When considering a challenge of this sort, we "defer to the credibility determinations made by the jury, and reverse only when no rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *United States v. Dumeisi*, 424 F.3d 566, 581 (7th Cir. 2005). In asserting insufficiency of the evidence, Christ "carries a heavy burden" because "[w]e view the evidence in the light most favorable to the prosecution." *United States v. Leahy*, 464 F.3d 773, 794 (7th Cir. 2006) (citation omitted). Christ was convicted of committing visa fraud in violation of 18 U.S.C. §§ 371 and 1546. Accordingly, we consider whether the government presented sufficient evidence that he conspired to obtain non-immigrant visas, acting willfully, and with knowledge that the visas were obtained by a false statement, or otherwise procured by fraud. When proof of a conspiracy is being considered, the government need not have shown evidence of a formal agreement. *United States v. Carraway*, 108 F.3d 745, 750 (7th Cir. 1997). Rather, "the evidence must show both the existence of the conspiracy and that the defendant knowingly participated in it." *United States v. Hightower*, 96 F.3d 211, 214 (7th Cir. 1996) (citation omitted).

We conclude that the government presented evidence sufficient for a rational jury to find beyond a reasonable doubt that Christ engaged in a conspiracy to commit visa fraud. First, the Grigaitis brothers testified that Christ told them to complete the applications by stating that the purpose of visiting the United States was tourism. The jury heard testimony, however, that the men intended

to find work upon their arrival. Christ argues that this evidence does not show intent on his part to commit visa fraud because there was no evidence showing that he knew his advice to be untrue. While that may be the case, there also was no evidence showing that Christ had any reason to think that the co-conspirators were, in fact, traveling to the United States for tourism. Testimony that Christ provided any reason to the Grigaitis brothers, especially when the evidence showed that he had a relatively unfamiliar relationship with them, was circumstantial evidence that Christ conspired to submit false statements in an attempt to procure visas.

Next, Aivaras testified that he filled out an application for himself, for Masiliunas, and for Stauga in Christ's presence. The evidence showed that Christ then adjudicated or submitted referrals on those applications. There was no evidence suggesting that Masiliunas or Stauga filled out their own applications. The strongest attack the defense mounted against Aivaras's testimony on this point was when defense counsel argued during closing that, based upon his observation, the applications were not written by the same person. While counsel invited the jury to draw the same conclusion, we view all of the evidence in the light most favorable to the government, *Leahy*, 464 F.3d at 794, and conclude that a rational jury could have accepted Aivaras's testimony that Christ submitted the three applications knowing them to have been completed by the same person. A reasonable inference drawn from this evidence is that Christ was working with his co-conspirators to procure visas by fraud. *See Carraway*, 108 F.3d at 750 (holding that a "jury properly may find an agreement to conspire based upon circumstantial evidence and reasonable inferences drawn there-

from concerning the relationship of the parties, their overt acts, and the totality of their conduct.").

The jury also heard evidence that Christ submitted referrals with the applications of Robertas's family members stating that they were well and favorably known to him, and that expeditious processing of their applications was in the United States' national interest. As noted above, however, Robertas testified that Christ had never met any of his family members. Accordingly, evidence that Christ submitted referrals on their behalf amounted to strong evidence supporting the jury's finding regarding his guilt. Additionally, the testimony and evidence at trial consistently affirmed that referrals were to be extended, if at all, to persons of a stature able to enhance diplomatic relations, such as government officials, businessmen, and scientists. Christ, however, submitted referrals on behalf of Robertas's family, Stauga, and Aivaras. With the exception of Aivaras, Christ had not met any of these people, and there was no indication that any of them fit the description of a suitable referral recipient. This deviation from the referral policy provided the jury with additional evidence that Christ was involved in a conspiracy to procure visas by fraudulent means.

Although all of the evidence set forth above provided a basis from which the jury could find that the government met its burden in proving Christ's guilt beyond a reasonable doubt, Christ argues that his acquittal on the bribery charge served to undercut this proof to such a degree that it could not sustain his conviction. The conviction for visa fraud combined with the acquittal on bribery, Christ asserts, amounts to a finding that he engaged in the conspiracy, and used his hard-earned

position of influence at an American Embassy, for no return benefit to himself. While holding a certain practical appeal by calling into question Christ's motive, this argument is of little legal import. There is no requirement under either 18 U.S.C. §§ 371 or 1546 that the government prove that Christ received anything of value in exchange for his participation in the conspiracy. *See, e.g., United States v. Soy*, 545 F.3d 766, 768 (7th Cir. 2006). The jury was free to weigh any lack of motive when it considered whether Christ engaged in visa fraud. Even though they did not believe that Christ received the second motorcycle as a bribe, the jury members were satisfied that the substantial evidence presented by the government established his guilt for conspiracy to commit visa fraud, and we will "neither reweigh the evidence nor substitute our judgment of the facts for that of the factfinder." *United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005) (citation omitted). Furthermore, contrary to Christ's assertion, there was evidence in the record that could have answered the question of why Christ engaged in the criminal conduct for which he was convicted. It is undisputed, for example, that Christ was a collector of antique motorcycles. Perhaps he viewed the visa scheme as a means of developing relationships with people who consistently dealt with such motorcycles. Additionally, there was testimony that fraud was widespread at the Embassy in Vilnius. Perhaps the volume of fraudulent applications convinced Christ that he could cultivate these relationships by adjudicating fraudulent applications and submitting fraudulent referrals with a reduced risk of detection. While the jury members themselves may have been unsure as to *why* Christ engaged in this conduct, questions regarding motive likely became less and less important as the evidence mounted

*that* Christ engaged in this conduct. Accordingly, we are confident that the evidence presented was sufficient to support the jury's verdict beyond a reasonable doubt and conclude that the conviction was supported by sufficient evidence. *See Leahy*, 464 F.3d at 796.

In addition to the issues already considered, Christ argues that he was entitled to a missing witness jury instruction because the government failed to call Eichblatt and another Foreign Service Officer, Sean Wiswesser, as witnesses at trial. Eichblatt formulated the Embassy's referral policies, and both Eichblatt and Wiswesser had knowledge of those policies. Additionally, Eichblatt adjudicated Aivaras's and Stauga's applications, and Wiswesser approved the issuance of visas for Robertas's family. Christ asserts, as he did at trial, that the testimony of Eichblatt and Wiswesser would have illuminated for the jury not only the referral procedure in place at the Vilnius Embassy, but also the sufficiency of the specific referrals upon which these officers relied in approving the applications in question. In denying Christ's request for a missing witness instruction, the district court found that ample testimony regarding the Embassy's referral policies had been presented, and that Eichblatt and Wiswesser were available for Christ to call as witnesses if he so chose. For a missing witness instruction to be given, a defendant must show (1) that the absent witness was peculiarly within the government's power to produce, and (2) that the testimony of the witness would elucidate issues in the case without being cumulative in nature. *United States v. Romo*, 914 F.2d 889, 893 (7th Cir. 1990). A witness is peculiarly within the government's power to produce when the witness is physically available only to the government, or where the witness's relationship

with the government makes his testimony, in pragmatic terms, available only to the government. *Id.* at 893-894. The district court has broad discretion in deciding whether to give a missing witness instruction, *United States v. Grant*, 396 F.3d 906, 910 (7th Cir. 2005), and we will disturb that decision only where serious error has occurred. *United States v. Addo*, 989 F2d 238, 242 (7th Cir. 1993).

Regarding the unavailability of Eichblatt and Wiswesser, Christ argued that their employment with the State Department made them pragmatically unavailable to the defense. Employment by a party has been found to be a basis for pragmatic unavailability because "there is likelihood of bias on the part of the person not called as a witness in favor of one party . . . ." *Yumich v. Cotter*, 452 F.2d 59, 64 (7th Cir. 1971). In *Yumich*, this court concluded that the district court erred in not giving a missing witness instruction where the municipal defendant called only five of fifteen to twenty police officers who witnessed an altercation between officers and the plaintiff. While the district court found that the officers were equally available to all parties, we held that the officers' employment with the city, as well as their "strong personal interest in the success of the city's defense of their conduct on the occasion in question," rendered them unavailable to the plaintiff. *Id.; see also United States v. Mahone*, 537 F.2d 922, 926-27 (7th Cir. 1976) (holding that an officer who was involved in the arrest initiating the case was pragmatically unavailable to the plaintiff because of his association with the United States in building its case, as well as his "interest in seeing his police work vindicated by a conviction of the defendant").

Christ conceded during the charge conference that he never asked the government to produce Eichblatt and

Wiswesser. Christ's failure to interview the witnesses, or even ask the government to produce them, leaves him at a disadvantage in arguing that their testimony would have exhibited bias rendering them pragmatically un-available to him. *See United States v. Montoya*, 676 F.2d 428, 431 (10th Cir. 1982) (holding that the district court did not abuse its discretion in deciding that a witness was equally available to both sides where the defendant had not followed up on attempts to contact the witness, and had not asked for the government's help in locating him). This disadvantage notwithstanding, Christ attempts to liken Eichblatt and Wiswesser to the witnesses in *Yumin* and *Mahone*, relying on their employment with the State Department and arguing that they would suffer profes-sional and reputational damage if Christ was acquitted. The case before us, however, is easily distinguishable from *Yumin* and *Mahone* because Eichblatt and Wiswesser did not have the personal stake in Christ's conviction that arises when an officer's own conduct is the subject of the suit, or where official conduct in making an arrest is an issue upon which a conviction hinges. Put another way, we fail to see how Eichblatt or Wiswesser was vin-dicated by Christ's conviction. Likewise, we fail to see how they would have been implicated in any way by Christ's acquittal simply because they had knowledge of, or even participated in the formation of, the Embassy's referral policy or relied on referrals submitted by Christ. Accordingly, we conclude that the district court did not err in finding that Eichblatt and Wiswesser were avail-able to Christ.

While this is sufficient to affirm the district court for declining to give a missing witness instruction, we fur-ther conclude that the district court correctly decided

that any testimony Eichblatt and Wiswesser could have offered on the referral policy, to the extent it was relevant, would have been redundant. The referral policy was testified to by Kundrotiene and Karen Christensen, the latter a division chief with the Bureau of Consular Affairs at the State Department. Additionally, the government introduced a State Department memo outlining referral policies, and particularly the stature of the individuals to whom referrals should be given. However, confirmation that the relevant aspects of the referral policy had been fully presented came from statements attributed to Christ himself, and testified to by Diplomatic Security Service Agent Christopher McCormack. McCormack was assigned to investigate allegations of fraud at the Vilnius Embassy, and in the course of that investigation, he interviewed Christ. During that interview, Christ gave a description of the referral policy which included the preferred stature of individuals who receive referrals, how well known the applicant should be to the referring officer, and the benefits afforded to an applicant who receives a referral. Christ's description matched up in all material respects with the other evidence the government presented at trial. Upon considering the evidence presented at trial as a whole, we agree with the district court that there was nothing to be gained by yet more testimony regarding the referral policies. *See Mahone*, 537 F.2d at 927 ("In cases . . . where it is debatable whether the absent witness' testimony would have elucidated the issues in the case, there should be latitude for the judge to decide whether the requested instruction would be unnecessary and time consuming for the jury."). Having determined that the district court did not err in making its findings on either factor of the relevant analysis, we conclude that it did not

abuse its discretion in declining to give the requested missing witness instruction.

Christ's remaining challenges on appeal can be resolved based on our findings above. First, after the government's direct examination of Roland Slabon during which he testified about Christ's inquiries regarding certain motorcycles and their costs, Christ elicited testimony favorable to his defense during cross-examination. Specifically, Slabon's testimony called into question whether Christ knew the value of the motorcycle he allegedly received as a bribe when conspiring to commit visa fraud. On re-direct, the government questioned Slabon regarding a subpoena and a check for $975.00 he received from Christ. Christ objected on relevancy grounds, arguing that it was improper to use this payment to raise the specter of bias because it had been paid to Slabon as required by Federal Rule of Criminal Procedure 17.[2] The district court overruled Christ's objection, and allowed the government to make the inquiry. We review such evidentiary rulings for abuse of discretion, and will only disturb the decision of the district court where it had a substantial influence over the jury. *United States v. Hernandez-Rivas*, 348 F.3d 595, 600 (7th Cir. 2003). When considering the influence any erroneously admitted testimony had over the jury, we weigh "(1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative;

---

[2] "A marshal, deputy marshal, or any nonparty who is at least 18 years old may serve a subpoena. The server must deliver a copy of the subpoena to the witness and must tender to the witness one day's witness-attendance fee and the legal mileage allowance." Fed. R. Crim. P. 17(d).

(3) whether other evidence corroborated or contradicted the witness's material testimony; and (4) the overall strength of the prosecution's case." *Id.* (citation omitted). To the extent that the government's questioning prejudiced Christ at all, it prejudiced him on the question of whether he accepted the second motorcycle as a bribe. Christ was acquitted of that charge, however, and we therefore fail to see how any prejudice resulted from the questioning. Moreover, the bribery charge has no effect on the issues before us because, as we concluded above, the government presented such substantial evidence of Christ's guilt regarding the visa fraud charge that it withstands even acquittal on the bribery charge. Because of the strength of the government's case on the visa fraud charge, the minimal importance of the challenged testimony to the government's case as a whole, and the lack of any prejudice to Christ, we find that any error the district court committed in allowing said testimony was harmless.

Next, Christ argues that the district court erred in denying his motion for a new trial based upon the insufficiency of the evidence, the court's evidentiary rulings, and its failure to give the jury a missing witness instruction. A district court may vacate a judgment and grant a new trial if the interest of justice so requires, Fed. R. Crim. P. 33(a), and we review that decision for an abuse of discretion. *United States v. Hendrix*, 482 F.3d 962, 967 (7th Cir. 2007). As set forth above, there was more than sufficient evidence to support Christ's conviction for conspiracy to commit visa fraud, and the district court did not commit error in making the challenged evidentiary rulings, nor in instructing the jury. That being that case, there is no basis from which Christ can argue that the

interests of justice require that he be afforded a new trial. Accordingly, we find that the district court did not abuse its discretion in denying Christ's motion for a new trial.

Finally, Christ argues that his sentence was unreasonable because the district court imposed an enhancement based on its unsupported finding that Christ's crime involved more than six visas. United States Sentencing Guidelines § 2L2.1(a) establishes a base offense level of 11 for the visa fraud crime of which Christ was convicted. The district court found that Christ's abuse of a position of public trust warranted a two-level enhancement pursuant to U.S.S.G. § 3B1.3, and Christ does not challenge this finding. The parties are therefore in agreement that Christ had an offense level of at least 13. Their dispute, however, centers on a second enhancement the district court applied pursuant to U.S.S.G. § 2L2.1(b)(2)(A), which allows a three-level increase when a defendant's crime involved between six and twenty-four documents. An offense level of 13, when combined with Christ's lack of any prior criminal convictions, carries with it an advisory guideline range of twelve to eighteen months. An offense level of 16, however, carries with it an advisory guideline range of twenty-one to twenty-seven months. After finding that Christ's crime involved six or more visas, and that he therefore had an offense level of 16, the district court sentenced Christ to twenty-four months in prison. While our review of a district court's interpretation of the Guidelines is de novo, we review the factual findings made in applying the Guidelines for clear error and will reverse only if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Johnson*, 227 F.3d 807, 812-13 (7th Cir. 2000) (internal quotations and citations omitted).

The parties do not dispute that the visas of the co-conspirators are attributable to Christ, but Christ argues that there was no basis upon which the district court could attribute more than those four visas to him. However, we found above that the family application evidence was not only admissible at trial, but that it amounted to evidence of conduct undertaken in furtherance of the charged conspiracy. Such evidence certainly qualifies as relevant conduct under the Guidelines, which directs consideration of "all acts . . . committed, . . . counseled, commanded, induced, procured or willfully caused by the defendant . . . . that occurred during the commission of the offense of conviction . . . ." U.S.S.G. § 1B1.3(a)(1)(A). While there was no special verdict form allowing us to determine the jury's specific finding regarding the family application evidence, we see no clear error in the district court's finding by a preponderance of the evidence that Christ's crime involved the family's visa applications. *See United States v. Frith*, 461 F.3d 914, 917 (7th Cir. 2006) (noting that even conduct underlying an acquitted charge may be considered as relevant conduct as long as it is proved by a preponderance of the evidence). The parties also dispute the district court's inclusion of visas other than those of the co-conspirators and Robertas's family, but we need not resolve that dispute because there is no contention that their inclusion would establish that Christ's crime involved more than twenty-four visas, thereby allowing application of a six-level enhancement. *See* U.S.S.G. § 2L2.1(b)(2)(B). Because the district court was presented with sufficient evidence at trial to support its finding at sentencing that Christ's crime involved between six and twenty-four visas, we conclude that it correctly applied a three-level enhancement

pursuant to U.S.S.G. § 2L2.1(b)(2)(A), and that the sentence imposed was reasonable.

## III.

We conclude that the prosecution presented sufficient evidence to support Christ's conviction beyond a reasonable doubt. We further conclude that the district court's rulings regarding the admissibility of the challenged evidence were not in error and that there was no abuse of discretion by the district court in declining to give a missing witness instruction. Based upon those findings, it is clear that Christ was not entitled to a new trial, and the district court did not abuse its discretion in denying his request for one. Finally, because there was a sufficient basis upon which the district court could properly apply the challenged sentencing enhancement, we conclude that Christ's sentence was not unreasonable. Accordingly, we AFFIRM both Christ's conviction and sentence.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
