**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert E. KING, Defendant–Appellant.**

No. 97–2249.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1998.

Decided June 25, 1998.

James M. Warden (argued), Office of the U.S. Atty., Indianapolis, IN, for Plaintiff–Appellee.

Robert W. Hammerle (argued), Hammerle, Foster & Long–Sharp, Indianapolis, IN, for Defendant–Appellant.

Before WOOD, JR., EASTERBROOK, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

A jury determined that Robert King had committed a series of bank robberies in Indianapolis between July 1994 and January 1996. It therefore convicted King on two counts of armed bank robbery (18 U.S.C. § 2113(a) & (d)), three counts of bank robbery (18 U.S.C. § 2113(a)), and two counts of using a firearm during and in relation to the commission of a crime of violence (18 U.S.C. § 924(c)). The district court sentenced King to a prison term of 562 months. He now appeals his convictions and sentence, contending that improper comments during the government's rebuttal closing argument deprived him of a fair trial, and alternatively, that the district court abused its discretion in departing upward under the Sentencing Guidelines to account for the fact that King committed all five bank robberies while on supervised release from an earlier bank robbery conviction. For the reasons set forth below, we reject King's arguments and affirm his convictions and sentence.

## I.

The first bank robbery with which King was charged took place on July 26, 1994, but King was not apprehended for another eighteen months, by which time he had committed a series of additional robberies. King ultimately was charged with six such robberies, but the jury convicted him only of five. It was not until King robbed a branch of the National City Bank on December 14, 1995 that his identity became known. Witnesses to the previous robberies had generally described the culprit as a balding white male, standing approximately five feet, nine inches tall and weighing approximately 180 pounds. Although that description generally matched King's physical characteristics, the authorities were unable to positively identify King as the perpetrator because of the various disguises he wore to each of his robbery venues. After the December 14, 1995 robbery, however, the first at which King displayed a firearm, a bank employee positively identified King after viewing a photo array of six white males with similar appearances. The employee had observed King in full disguise during the robbery but had also seen King's face without the disguise as he fled the bank. From her office window, the employee had observed the unmasked King from a distance of approximately twenty-five feet. Having procured a positive identification, Sheriff's deputies then obtained and executed a search warrant at King's apartment, finding $5,300 in cash, various books relating to disguise and identification, instructions for a Slim Jim device, a face mask, a wig, several pairs of gloves, and a police scanner. The deputies also had a warrant for King's arrest, but he was not on the premises at the time.

Early on the morning of January 3, 1996, King struck a final time, robbing a branch of the Indiana Federal Credit Union before the bank had opened for the day. Wearing white gauze around his face, King approached the credit union's manager in the parking lot and forced the manager to let him into the bank. Displaying a handgun, King then required an assistant manager to open the bank's vault. King ultimately escaped with $114,164 and the bank's surveillance tape. Eleven ten dollar bills taken by King during the robbery had been recorded by the credit union on a bait money list-meaning essentially that the bills were marked.

Upon leaving the credit union, King traveled to Champaign, Illinois, where he contacted his friend Joe Rodman, who lived there. Rodman was at work at the time, but he agreed to meet King later that day. King described to Rodman the circumstances of the January 3 robbery in some detail, telling him how he had confronted the manager in the parking lot and how he had made off with the surveillance tape. A few days later, before leaving town, King gave Rodman three packages, asking that he deliver one to King's mother and another to a woman named Sue Phelps. King told Rodman to keep the third package for himself. All three packages contained cash from the January 3 robbery, including seven of the marked ten dollar bills. The package for Phelps, who apparently was King's girlfriend, also contained audio cassettes with King's voice. Rodman spent some of the money contained in his own package, but he never delivered the other two packages as King had directed. Instead, on January 25, after a detective had interviewed Rodman for the second time, Rodman told the detective about the packages and ultimately turned them over. When King subsequently contacted Rodman on February 2 upon returning to Champaign, Rodman alerted the authorities, and soon thereafter, King was arrested.

After the arrest, the FBI was able to link King to the earlier robberies as well. With respect to an April 12, 1995 robbery of a branch of the Society National Bank, a customer who had been in the bank at the time of the robbery identified King as the perpetrator. In addition, a maintenance employee for an apartment complex located near the bank identified King as the man he had seen in the parking lot of the complex both before and after the robbery. The maintenance employee placed King in the vicinity of two vehicles, one of which was owned by King's mother. The other vehicle had been linked to the robbery by another witness.

With respect to a March 6, 1995 robbery of another branch of the Society National Bank, a bank teller identified King as the man who had robbed her. The teller also identified the pick-up truck King had used as a get-away vehicle during the robbery. Another witness explained that he had seen King with the pick-up truck in a parking lot near the bank shortly before the time of the robbery.

Finally, with respect to a July 26, 1994 robbery of a branch of the Union Federal Savings Bank, the bank's branch manager identified King from a photo spread. A bank surveillance camera also caught the robber on film as he left the bank, and several witnesses testified at trial that King was the man depicted in the photograph.

Finally, Sue Phelps, the intended recipient of one of the packages King had given to Rodman, also testified on the government's behalf at trial. She said that she had met King in September 1993, while she was working as an exotic dancer at a topless club in Indianapolis. King eventually became her regular customer, meaning that he paid her to dance and to sit with him at the club. Phelps testified that King sometimes spent more than $1,000 in a single evening at the club. By late 1994 and early 1995, Phelps and King began to see one another outside the club as well. Phelps explained that the two would go shopping together and that King would buy her expensive gifts and clothing, always in cash. In April 1995, however, King broke his foot in an automobile accident and was unable to visit Phelps at the dance club with his usual frequency. In the fall of 1995, Phelps visited King at his apartment and as they talked, she asked why he had stopped coming around and showering her with gifts. Phelps explained that at that point, King left the room for a moment, returning with a newspaper article that described his spree of bank robberies, complete with surveillance photographs from two of the robberies. He indicated to Phelps that this was the reason.

The jury convicted King on two counts of armed bank robbery, three counts of bank robbery, and two counts of using a firearm during and in relation to a crime of violence. Yet the same jury acquitted King on an additional bank robbery count. The district court subsequently sentenced King to a prison term of 562 months.

## II.

In attacking his various convictions, King makes but a single argument. He contends that the district court erred when it refused to grant his motion for a mistrial in response to what he contends were improper comments by the government in its rebuttal closing argument. Our review of the denial of a motion for mistrial is necessarily deferential. " '[W]e assume that the trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial,' " and we therefore review the judge's decision only for an abuse of discretion. *United States v. Butler*, 71 F.3d 243, 254 (7th Cir.1995) (quoting *United States v. Humphrey*, 34 F.3d 551, 556 (7th Cir.1994)).

A number of the witnesses who eventually identified King at trial as the perpetrator of a particular bank robbery had been interviewed by the authorities immediately after the particular robbery at issue. It was King's contention that the identification testimony of many of those witnesses was unreliable because their descriptions of the perpetrator had changed over time. Indeed, prior to trial, King had moved to suppress the identification testimony of certain witnesses for that very reason, arguing that the photo arrays used when the witnesses eventually identified King were unduly suggestive. The district court denied that motion after a hearing, and King has not pursued the issue on appeal. Yet once the identification testimony was admitted, King's counsel attempted to make the point with the jury that the identifications were suspect. One way that he did so was by suggesting in closing argument that the government should have called the officers who conducted the initial interviews immediately after each robbery:

[Y]ou have heard the descriptions from these witnesses. But you have also heard in each and every case witnesses whose testimony and description has changed over the period of a couple of years. And you know what is missing here with them

having the burden of proof? Where has there been one agent or police officer who has come in here to tell you what they actually said at the time of the robbery? There hasn't been one. They didn't call one agent who will tell you what they honestly said at the time of the robbery. And why is that important? You notice how they all come in now and say [five feet] and 180, [five feet] and 180.... And I submit to you that regardless, you can't tell in regard to people's recollection what they actually said unless you have the agents there that took the statement, and they didn't bother to call them.

(R. 81, at 642–43.) The Assistant United States Attorney ("AUSA") responded in his rebuttal closing argument by suggesting that the defendant had subpoena power and could have called the agents as easily as the government: "[T]he law in this case is that even though the defendant has no obligation to prove anything, he has the opportunity to subpoena witnesses, just as well as the Government. The defendant can call witnesses, or not, and you can draw the inference from the fact that he didn't call the agents, ladies and gentlemen, but the agents—" (*Id.* at 671.) At that point, King's counsel interjected an objection, but before the court could rule, the prosecutor continued: "I'll repeat for the jury, he has no obligation to call anyone, but he has an opportunity to call them, ladies and gentlemen." (*Id.*) Defense counsel then restated his objection, after which the court conferred with counsel off the record. When the argument continued, the AUSA made the following final comment on the matter: "Let me make very clear that the defendant has no obligation to call anyone, all right. And since he has no obligation you shouldn't hold that against him that he didn't call anyone. But he has the opportunity to call witnesses." (*Id.* at 672.) The district judge subsequently denied King's

motion for a mistrial, explaining that it was permissible for the government to have informed the jury that the defendant had the opportunity to call the allegedly missing witnesses. (*Id.* at 682.)

In considering whether a defendant was denied a fair trial by the government's closing argument, we look first to the allegedly offending comments in isolation to determine whether they were improper. If they were, we then look to the record as a whole to assess whether the improper comments denied the defendant the opportunity for a fair trial. E.g., *United States v. Morgan,* 113 F.3d 85, 89 (7th Cir.1997); *Butler,* 71 F.3d at 254. King contends that the AUSA's comments here were improper because they served to strip him of the presumption of innocence and to relieve the government of its burden of proof.[1]

In making that argument, King focuses not so much on the prosecutor's statement that he had the opportunity to call the agents, as he does on the suggestion that the jury could draw an adverse inference from King's failure to do so. We are not convinced that the prosecutor ever got that far, however. Once the prosecutor began to explain that the jury would be entitled to draw an inference from the fact that the defendant failed to call the agents, defense counsel interceded with an objection before the prosecutor could make his point. Defense counsel's objection prompted a conference with the court, and although the discussion was off the record, there is some indication that the court cautioned the prosecutor against suggesting that King had any responsibility to call the agents. (*See* R.81, at 682.) When the prosecutor then recommenced his argument, he explained to the jury that the defendant has no obligation to call any witnesses and that the jury should not hold the defendant's failure to call any witness against him. The

---

1. At one point in his brief, King also suggests that the prosecutor's comments impinged upon his right to remain silent. (Def. Br. at 7.) He never develops that argument, however, and we do not see how it could possibly be so. The prosecutor's comments were addressed not to King's failure to testify himself, but to his failure to call the agents who had previously interviewed certain of the identification witnesses. King

himself had no information bearing on what those witnesses may have told the agents in earlier interviews. The prosecutor's argument could not have infringed King's right to remain silent. *See United States v. Sblendorio,* 830 F.2d 1382, 1391–92 (7th Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988); *see also Butler,* 71 F.3d at 255.

prosecutor then reiterated. the point that the district court found to be proper argument under the circumstances—that the defendant had the opportunity to call witnesses, including the agents who had interviewed the government's identification witnesses.

■ In a case like this where the defendant himself has broached the subject of missing witnesses by asking the jury to in a sense penalize the government for its failure to produce the agents, the prosecutor's argument in response clearly was proper. As we explained in *United States v. Sblendorio*, 830 F.2d 1382, 1393 (7th Cir.1987), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988), the prosecutor's observation that the defense could produce a certain witness or witnesses if it wished neither alters the burden of proof nor penalizes the exercise of a constitutional right. Rather, the argument merely conveys information that "[t]he jury is entitled to know." *Id.*; *see also United States v. Knox*, 68 F.3d 990, 1000 (7th Cir. 1995), *cert. denied*, 516 U.S. 1119, 116 S.Ct. 926, 133 L.Ed.2d 854 (1996). To the extent that the prosecutor in this case may also have intimated that the jury could draw an adverse inference from the defendant's failure to call the agents, that too would be proper argument under *Sblendorio* because it was the defense that first broached the subject. *Sblendorio*, 830 F.2d at 1394. As *Sblendorio* explains, "once the defendant has opened the subject, two can play." *Id.* Asking the jury to draw an adverse inference in that circumstance "does not alter the burden of proof," as King asserts, but merely requests the jury "to draw its own conclusions from the defendants' choices in the conduct of the trial." *Id.*; *see also Butler*, 71 F.3d at 254 n. 8; *United States v. Dahdah*, 864 F.2d

55, 59 (7th Cir.1988), *cert. denied*, 489 U.S. 1087, 109 S.Ct. 1550, 103 L.Ed.2d 853 (1989). The district court thus did not abuse its discretion in allowing the government to respond in rebuttal to the argument of King's counsel and in thereafter denying King's motion for a mistrial.

### III.

King also challenges the district court's decision to depart upward from the applicable range under the Sentencing Guidelines to account for the fact that King had committed all five bank robberies while serving a period of supervised release from a sentence imposed on a prior bank robbery conviction. The district court noted that although King was assigned two criminal history points under U.S.S.G. § 4A1.1(d) because he had "committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status" (U.S.S.G. § 4A1.1(d)), he would have received those same two points had he committed only one rather than five bank robberies during that period.[2] The court reasoned that the two criminal history points assigned under section 4A1.1(d) did not adequately reflect the seriousness of King's behavior while on supervised release. This case was "out of the ordinary," the court believed, because "[v]ery rarely do we ever see a case in which somebody has [committed] more than one crime" during the period of supervised release, let alone five. (R. 83, at 133–34.) In the court's view, then, King's five robberies while serving a prior sentence of supervised release took his case outside the "heartland" of cases covered by section 4A1.1(d), warranting a two-level upward departure.[3] We

---

**2.** King also received one criminal history point under section 4A1.1(e) because he had committed at least one of the bank robberies less than two years after his release from imprisonment on an earlier sentence. Section 4A1.1(e) generally calls for the addition of two criminal history points in that circumstance, but because King had received two points under subsection (d), he could receive but one additional point under subsection (e). *See* U.S.S.G. § 4A1.1(e) ("If 2 points are added for item (d), add only 1 point for this item."). Although the district court primarily based its departure decision on the fact that King had committed all five robberies while

on supervised release, the court also noted that three of the five robberies had been committed within two years of King's release from prison on a prior sentence. (R. 83, at 133 & 136.)

**3.** Because King already was in the highest criminal history category (VI), the court departed by adding two levels to King's combined offense level. *See* U.S.S.G. § 4A1.3 (explaining possible departure where a defendant already is in the highest criminal history category). King has not challenged the extent of the departure in this appeal.

review the district court's decision to depart upward under the Sentencing Guidelines for an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 98–100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Porter*, 145 F.3d 897, 904–05 (7th Cir.1998). That standard, however, encompasses "review to determine that the discretion was not guided by erroneous legal conclusions." *Koon*, 518 U.S. at 100, 116 S.Ct. 2035.

King concedes that nothing in the Guidelines prohibits the district court from departing on the ground chosen here. *See Koon*, 518 U.S. at 95–96, 116 S.Ct. 2035 (court should first consider whether proposed ground for departure is forbidden by the Guidelines). He even agrees that the commission of five bank robberies while on supervised release may be sufficient to take his case outside the "heartland" of cases covered by the Guidelines. Despite that, King argues that the ground for departure chosen by the district court here was already accounted for via a four-level increase to his offense level under section 3D1.4 (combined offense level after grouping of multiple counts) in conjunction with the two criminal history points assigned under section 4A1.1(d) (offense committed while serving a period of supervised release). The government disagrees. Although it readily concedes that the four-level increase under section 3D1.4 accounted for the fact that King committed five bank robberies and that the two criminal history points assigned under section 4A1.1(d) accounted for the fact that King was on supervised release at the time he committed at least one of the robberies, the government insists that neither section took account of the fact that *all five* of the robberies were committed while King was on supervised release. According to the government, that fact made King's case sufficiently unusual to warrant the upward departure imposed here.

■ Upward departures are authorized under the Sentencing Guidelines to the extent that " 'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.' " U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). And according to the Sentencing Commission, each

Guideline applies to "a heartland of typical cases." *Koon*, 518 U.S. at 94, 116 S.Ct. 2035. As it noted in the introductory commentary to the Guidelines,

The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. ch.1, pt. A, intro. comment. 4(b). As the Supreme Court explained it in *Koon*, the Sentencing Commission "did not adequately take into account cases that are, for one reason or another, 'unusual,' " and the factor which makes the case "unusual" may therefore provide a proper basis for departure. *Koon*, 518 U.S. at 93, 116 S.Ct. 2035; *see also United States v. Furkin*, 119 F.3d 1276, 1283 (7th Cir.1997).

■ A case may be unusual either because it involves a factor not adequately considered by the Guidelines or because a considered factor is present in an exceptional way. *Koon*, 518 U.S. at 94–96, 116 S.Ct. 2035; *United States v. Otis*, 107 F.3d 487, 490 (7th Cir.1997). Here, the Guidelines do address the fact that a defendant may commit an offense while still under the supervision of another court on a previously-imposed sentence. *See* U.S.S.G. § 4A1.1(d). Because such a defendant is viewed as being more culpable and as having a greater likelihood of committing future crimes, two criminal history points are added. *See* U.S.S.G. ch. 4, pt. A, intro. comment. But a defendant qualifies for those two points by committing but a single offense while still serving a prior criminal justice sentence. Nothing in section 4A1.1(d) distinguishes such a defendant from someone like King who commits multiple offenses while still under the earlier sentence.

■ Section 4A1.3 of the Guidelines recognizes that departures based on factors utilized in establishing a defendant's criminal history may be appropriate where the resulting criminal history category "does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes."

U.S.S.G. § 4A1.3. The district court found that to be the case here because King proceeded to rob five banks between July 26, 1994 and January 3, 1996, despite the fact that he was still under the supervision of another court with respect to an earlier bank robbery conviction. The district court believed that those five bank robberies were sufficient to take King's case outside the "heartland" of section 4A1.1(d). As the court explained it, "[v]ery rarely do we ever see a case in which somebody has done more than one crime during this period of time. Sometimes even two, but not five." (R. 83, at 13334.) That type of finding, which is based on a comparative assessment of cases under the Guidelines, is precisely the sort that *Koon* tells us should be accorded deference on appeal. *Koon,* 518 U.S. at 98–99 & 112, 116 S.Ct. 2035; *see also Porter,* 145 F.3d at 904–05.[4] We therefore have little difficulty concluding that the district court did not abuse its discretion in finding that King's commission of five additional bank robberies while serving the supervised release portion of his earlier sentence was sufficiently unusual to take his case outside the "heartland" of section 4A1.1(d). *See United States v. Doe,* 18 F.3d 41, 47–48 (1st Cir.1994) (affirming departure based on fact that the defendant had committed at least five earlier crimes either while on bail, awaiting trial, or under some other type of court supervision); *United States v. Starr,* 971 F.2d 357, 361 (9th Cir.1992) (criminal history points added under section 4A1.1(d) did not account for the fact that at the time of the defendant's offense, there had been an outstanding warrant for his arrest with respect to an earlier probation violation); *see also Furkin,* 119 F.3d at 1284 (affirming departure based in part on district court's finding that the defendant's obstruction of justice was extensive and particularly egregious).

## IV.

King's brief also asserts that he is entitled to a new trial because the government violated his rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to disclose that a paper item with an identifiable fingerprint had been found in a parking lot near where a get-away vehicle may have been parked during the January 3, 1996 robbery of the Indiana Federal Credit Union. Through questioning at oral argument, however, we learned that there is no evidence in the current record to establish that the print in fact exists or that it has been positively identified as belonging to someone other than King. There is thus nothing in the record to show that the information the government is alleged to have suppressed was in any way favorable to King. At our suggestion, defense counsel requested permission to withdraw the *Brady* argument in order to preserve it for further development in a motion under 28 U.S.C. § 2255. We now grant that request and deem the Brady argument withdrawn. That argument is preserved should King decide to initiate a post-conviction proceeding under section 2255.

AFFIRMED.

---

4. In affirming the departure in this case, we express no opinion as to how many offenses would be sufficient to take a case outside the "heartland" of section 4A1.1(d). *Cf. United States v. Croom,* 50 F.3d 433, 435 (7th Cir.1995) (district judge failed to explain why subsections (d) and (e) of section 4A1.1 did not sufficiently account for the fact that the defendant had committed one firearm offense while on parole from an earlier sentence and within two years of his release from prison, and a second firearm offense while awaiting trial on the first firearm charge).