In the

# United States Court of Appeals
## For the Seventh Circuit

No. 09-2569

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WOSVALDO VILLEGAS,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 00260-1—**Virginia M. Kendall**, *Judge*.

ARGUED SEPTEMBER 27, 2010—DECIDED AUGUST 23, 2011

Before ROVNER, EVANS*, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. A confidential informant alerted law enforcement that Wosvaldo Villegas planned to rob an armored car. After the Federal Bureau of Investigation ("FBI") opened an undercover investigation,

_____

* Circuit Judge Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

the informant and Villegas met and spoke numerous times regarding the planned robbery. These meetings and conversations were recorded. On the day of the planned robbery, Villegas and the informant met in a Walgreens parking lot approximately a mile from the proposed robbery location where Villegas provided the informant with stolen license plates for use on his vehicle. Villegas was arrested, and was charged and convicted of attempted Hobbs Act robbery, and with aiding and abetting the attempted robbery, in violation of 18 U.S.C. § 1951.

Villegas now challenges his conviction, arguing that there was insufficient evidence to support the verdict, that the district court erred in declining to give a missing witness instruction, and that the trial court erred in allowing into evidence his prior conviction and alleged criminal activity. But we find that sufficient evidence supported the conviction and that the district court did not abuse its discretion in declining to give a missing witness instruction because the informant was physically available to both parties and was not prevented by the government from testifying for the defendant. We also conclude that the district court did not abuse its discretion by admitting Villegas's prior conviction and alleged drug activity into evidence, as Villegas opened the door to this information.

Finally, Villegas challenges the application of a five-level enhancement under U.S.S.G. § 2B3.1(b)(2)(C), which requires district courts to increase a defendant's offense level by five points "if a firearm was brandished or possessed." Because we find that Villegas is liable for the

informant's possession of the weapon in preparation for the offense, we affirm the application of the enhancement.

## I. BACKGROUND

This case began when a confidential informant, Jose Diaz Martin Garibay, told federal Drug Enforcement Administration ("DEA") agents that on or about February 19, 2007, he had been approached by Villegas. Villegas had asked Garibay if Garibay wanted to help rob an armored car. After receiving the information from the DEA, the FBI interviewed Garibay regarding the meeting he claimed he had with Villegas. Garibay explained that his associate, Villegas, had a plan to rob an armored car in the Chicago area of approximately $500,000. According to Garibay, Villegas allegedly knew someone within the armored car company who had knowledge about the business.

The FBI began an undercover operation, in which Garibay would introduce an undercover agent to Villegas as an accomplice to the plot. On February 26, 2007, Garibay and Villegas had a recorded phone conversation where the two agreed to meet in person. During the recorded meeting on February 27, Villegas, Garibay, and the undercover agent discussed the details of the robbery plot. Villegas specifically talked about what armored vehicle drivers do during ATM servicing, said that the group would need to do practice runs before the actual robbery, and said that he would be there with binoculars to oversee the event. Villegas indi-

cated that he had a "friend" who was serving as a driver
and ATM servicer for the armored car company. He
discussed punching or using a taser gun on this "friend"
during ATM servicing in order to stop the employee
from reaching for his gun and cause him to drop the
money bag. Villegas did not discuss the proposed
location, the identity of his "friend," or the name of the
armored car company.

On March 6, 2007, Garibay, Villegas, and the agent met
again to discuss the robbery. By this time, Villegas had
become suspicious of the agent. During this meeting,
Villegas asked the agent how Villegas could know the
agent was not a cop. After some discussion, the conversa-
tion returned to the robbery. Villegas stated that the
group should utilize a rental car with somebody else's
license plate on it. After the meeting, the agent attempted
to deal directly with Villegas, but Villegas only communi-
cated with Garibay and cut the agent out of the plan.

On April 2, 2007, Garibay and Villegas met and travelled
to what was then LaSalle Bank on West Archer Avenue
in Chicago and watched a series of ATMs at the bank
for over two hours. While conducting surveillance,
Villegas discussed where the "van" parked when the
employees serviced the ATMs at the bank location. Villegas
also asked Garibay, "[h]ave you ever pulled out a gun
on somebody to rob him?" Garibay answered yes, after
which Villegas asked, "[h]ow does it feel . . . . Do you get
nervous or not?" Garibay stated that ". . . if the guy tries
to pull one out, then I do. . . . I'm going to have to shoot
him." Garibay later suggested a plan involving weapons,

specifically, "[h]ave [my friend] bring his car and stay over there—park it . . . with the weapons in it. . . . As soon as I see it . . . run and bring me the guns. . . ." During the conversation, the two also mentioned the use of counterfeit money, applying for credit cards using false information, and alleged drug activity.

Villegas and Garibay met again on April 9, 2007, to watch an armored truck. After the meeting, Garibay and Villegas spoke on the phone. Villegas said that Garibay could use his own car, and that Villegas would get stolen plates. Garibay mentioned that he was still working on getting the gun. On April 26, 2007, the FBI placed a bulletproof vest, ammunition, and a handgun that did not have a firing pin in the trunk of Garibay's car so that he could show the items to Villegas. In the evening, Villegas and Garibay met. When Garibay showed Villegas the items in the trunk, Villegas asked, "[d]oes it work and everything?" After Garibay said that he would wear the vest, both men got in the car. Villegas directed Garibay to his house, and said that he would give Garibay his garage door opener so that Garibay could drive from the bank right to Villegas's garage to change the plates and discard the items used in the robbery, including the gun. The two also went over the plan for executing the robbery and agreed to meet the following morning at 9:00 a.m.

On April 27, 2007, at approximately 9:00 a.m., the two men met at a Walgreens parking lot located on Archer Avenue, approximately one mile from the LaSalle ATM location. Villegas told Garibay that the truck was "over

there," and handed the license plate to Garibay, who then replaced the rear plate on Garibay's car in Villegas's presence. Garibay and Villegas also discussed what hat Garibay would wear during the robbery. Minutes later, Villegas was arrested. The garage door opener was found in Villegas's car. Following his arrest, Villegas agreed to speak with FBI agents. He stated that Garibay had given him the license plate the night before. When told that the previous night's meeting was recorded, Villegas stated that Garibay had given him the plate several months before.

On June 8, 2007, a grand jury returned a one-count indictment charging Villegas with attempted Hobbs Act robbery and aiding and abetting the attempted robbery. The government advised the court that Garibay, who was facing removal proceedings, was no longer considered an active source, and that neither the DEA nor FBI would obtain temporary immigration status for him. The defense filed a motion to compel the prosecution to ask the court for a material witness warrant, but then withdrew the motion and filed, with the government's agreement, a motion requesting a material witness warrant. The court granted the motion, and in October, Garibay was released from immigration detention and taken into custody pending trial.

At trial, the government called the case agent, Special Agent Sean Burke, who testified about his investigation of the case, explained the surveillance footage, and laid the foundation for the admission of video and audio recordings as well as the physical evidence obtained. The

government did not question the agent regarding a conversation the FBI had with Garibay in which Garibay stated that he knew Villegas to be a drug dealer who dealt in large amounts of cocaine. The government also did not question the agent about portions of the recorded conversations in which Garibay and Villegas discussed other potentially criminal activities.

On cross-examination, the defense asked the agent if he was aware of the mortgage broker-client relationship between Garibay and Villegas, and inquired as to how the agent gathered information about the nature of their relationship. He also asked, "[n]ow, did it dawn on you that it might be strange that Ozzie Villegas, the client in this mortgage deal, would be calling his mortgage broker to rob an armored car?" The defense also asked, "[a]nd you testified—is it safe to say, . . . that you didn't check into the backgrounds of either individual, either Ozzie or Garibay, to a great extent prior to getting into this FBI relationship with the armored car?" The defense also engaged in a line of questioning asking whether it was the job of the government or a government informant to "pressure somebody into committing a crime," and inquired into the number of phone calls Garibay made to Villegas leading up to the date of Villegas's arrest.

At sidebar, the government argued that the defense had opened the door to the parts of the conversations that were omitted, and that without being able to delve into those areas, the jury would be left with an erroneous picture of what the FBI knew about Garibay and Villegas.

The government also argued that because the defense raised the numerous phone calls between Garibay and Villegas, and used the words "pressure" and "coercion" (the latter of which does not, in fact, appear in the record), the door was opened to allow the government to complete the picture of the relationship between the two men.

The court agreed, stating that the defense "didn't open the door a crack and take a peak. You kicked it wide open and . . . suggested that [Villegas] was simply a customer of the mortgage company. . . ." The court went on, "[t]hen you kicked the door wide open again when you asked him all of these questions about how he knew him solely in that capacity as a client in the mortgage business, when in truth he knows him in this other capacity with drug dealing." The court allowed the government to inquire about the agent's knowledge about Villegas's past acts, and to read into evidence the entirety of the April 2, 2007 conversation.

On re-direct, the agent testified regarding Garibay's statement about Villegas's involvement in dealing cocaine, and inquired about a felony conviction from 2004 for financial identity theft in the Circuit Court of Cook County. The court gave a limiting instruction to the jury, instructing that "[y]ou may take the answer to that question about the felony conviction for the sole purpose of determining what the agent knew at the time that he began his investigation and for no other purpose." When the entirety of the April 2, 2007 recording was played for the jury, including the parts where

Villegas and Garibay discussed what the government believed to be drugs and credit card fraud, the district court instructed the jury that the evidence of acts other than those charged may be considered "only for the question of the relationship between the CI and the defendant and on an issue of entrapment."[1]

Additional evidence produced at trial showed that the license plates Villegas handed to Garibay on the morning of April 27 had been stolen off a government vehicle parked in the vicinity of Villegas's house, and that the garage door opener was found on the front passenger seat of the vehicle Villegas was found in at the time of the arrest.

As the trial continued, the government interviewed Garibay in the event that the defense elected to call him. The government stated that Garibay was hostile and upset about his removal proceedings and his current incarceration. Garibay made accusations that before being taken into immigration custody, he was approached by the defendant and a private investigator for the defense about altering his testimony. The government reported the contents of the interview to the court and defense counsel. The court held a hearing to determine whether a conflict existed in light of Garibay's claims. With the assistance of independent counsel, Villegas waived any conflict to the extent one existed.

---

[1] While the defense sought an entrapment instruction in its pre-trial motions, the court did not grant the instruction until the trial was underway.

Garibay was brought to the courthouse during trial, but neither the government nor Villegas called him as a witness. The defense, however, did seek a missing witness instruction on the ground that Garibay was an informant who made serious allegations against the defense, and was therefore unavailable to them. The trial court declined to give the instruction. After the close of the government's case, Villegas moved for a judgment of acquittal under Fed. R. Crim. P. 29(a), but the court denied the motion.

Villegas testified in his own defense, saying that Garibay was aggressive when he contacted him, and called him repeatedly to say that Villegas owed him something. Villegas said that Garibay made him feel that he had to attend meetings regarding the robbery. He also said that he had no intention of committing any violence against the armored car drivers, and did not, in fact, have a friend who worked for the company. He claimed that Garibay provided the stolen plates to Villegas the evening before the scheduled robbery. The jury also heard testimony from Villegas's mother and fiancée, who corroborated Villegas's version of events regarding his claim that Garibay delivered the license plates the night before the scheduled robbery. The defense also presented the expert testimony of Dr. Jeri Morris, a neuropsychologist, who testified that Villegas suffers from a low IQ and, as a result, was more susceptible to pressure from Garibay to commit the crime for which he was charged.

On November 20, 2008, the jury returned a guilty verdict and Villegas filed a renewed motion for a judgment of

acquittal under Fed. R. Crim. P. 29(c), or for a new trial under Fed. R. Crim. P. 33, which the court denied. At sentencing, Villegas contested the applicability of a five-level enhancement, pursuant to U.S.S.G. § 2B3.1(b)(2)(C), based on possession of a firearm. The district court determined that the gun enhancement was applicable, and also applied a two-level enhancement for obstruction of justice for giving knowingly false testimony under U.S.S.G. § 3C1.1. The court, finding the applicable guidelines range to be 108 to 135 months based on an offense level of 29, and a criminal history category III, sentenced Villegas to 87 months in prison.

On appeal, Villegas argues that: (1) there was insufficient evidence to support a guilty verdict; (2) the trial court erred in refusing to give the defendant's proposed missing witness instruction with respect to Garibay; (3) the court erred in ruling that the defendant had opened the door to the admission of evidence of other crimes, including drug dealing; and (4) the trial court erred in applying a five-level enhancement to the defendant's guidelines calculation based upon the possession of a gun.

## II. ANALYSIS

### A.  The Sufficiency of the Evidence

An argument that insufficient evidence supported a jury verdict is difficult to win. In reviewing such a challenge, we "view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution and uphold the verdict if 'any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Gallardo*, 497 F.3d 727, 737 (7th Cir. 2007) (citations omitted).

The Hobbs Act criminalizes robbery and attempted robbery that interferes with commerce or the movement of any article or commodity in commerce. The statute defines robbery as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property . . . ." 18 U.S.C. § 1951(b)(1). To prove an attempt, the government had to show only that Villegas acted with specific intent to commit the underlying offense, that is, that he intended to perform a robbery, and took a substantial step toward its completion. *See United States v. Bailey*, 227 F.3d 792, 797 (7th Cir. 2000) (citing *United States v. Dennis*, 115 F.3d 524, 534 (7th Cir. 1997)).

A substantial step is "'some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime.'" *United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008) (quoting *United States v. Manley*, 632 F.2d 978, 988 (2d Cir. 1980)); *see also United States v. Sanchez*, 615 F.3d 836, 844 (7th Cir. 2010). It is "something more than mere preparation, but less than the last act necessary before the actual commission of the substantive crime." *United States v. Barnes*, 230 F.3d 311, 315 (7th Cir. 2000). The line between mere preparation and a substantial step is inherently fact specific; conduct that would appear to

be mere preparation in one case might qualify as a substantial step in another. *Sanchez*, 615 F.3d at 844 (citing *United States v. Magana*, 118 F.3d 1173, 1199 (7th Cir. 1997)).

Villegas first argues that the government failed to prove that he took a substantial step toward the completion of the crime. The evidence produced at trial, however, did not portray Villegas as a mere "talker," but made reasonably clear that had Villegas not been interrupted, he would have participated in the robbery. First, on the day of his arrest, Villegas arrived at a pre-arranged meeting location approximately a mile away from the ATM location, and told Garibay that he had seen the armored truck "over there." Villegas brought with him the license plates to be used on Garibay's car, observed Garibay change the rear plate, discussed with Garibay what hat Garibay would wear during the robbery, and had in his car a garage door opener that Villegas previously said he would give to Garibay to use after the robbery. All of this happened just one day after Villegas and Garibay met to discuss the details of the robbery. During that meeting, Villegas asked Garibay if the gun in his trunk "work[ed] and everything," and the two agreed to meet the next morning. These acts also follow almost eight weeks of recorded conversations in which specific details of the robbery were discussed. In this context, Villegas's conduct on the day of his arrest went beyond mere preparation and was "strongly corroborative of the firmness of [his] criminal intent." *United States v. Rovetuso*, 768 F.2d 809, 821 (7th Cir. 1985) (quotations omitted). Viewed in the light most favorable to the gov-

ernment, we find that a rational trier of fact could have found that Villegas's conduct constituted a substantial step towards the commission of a robbery.

Villegas also argues that the government did not prove "actual or threatened force, or violence," as required by the statute. However, there are numerous references to violence in the recorded conversations, including Villegas's discussion of the use of a taser on the driver, punching him, and, of course, the numerous discussions of the gun provided to Garibay by law enforcement and its potential use. Villegas testified that he did not have any intent on "doing any of this stuff" (referring to the violent acts), but such testimony by itself does not render the government's case insufficient. The evidence that Villegas had direct knowledge of the gun, questioned whether it worked, and discussed using the gun, a taser, and physical force was sufficient for a rational jury to conclude that Villegas had the specific intent to use force or violence. Given that we must uphold the verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Gallardo*, 497 F.3d at 737, Villegas's insufficiency claim cannot succeed.

## B.  Missing Witness Instruction

Generally, our review of a decision whether to give a particular jury instruction is for an abuse of discretion. *United States v. Tavarez*, 626 F.3d 902, 904 (7th Cir. 2010) (citing *United States v. Macedo*, 406 F.3d 778, 787 (7th Cir. 2005)). The district court has broad discretion in

deciding whether to give a missing witness instruction. *United States v. Gant*, 396 F.3d 906, 910 (7th Cir. 2005). In denying Villegas's request for a missing witness instruction with respect to Garibay, the district court found that Garibay was physically available to the defense, had made statements indicating that he was not biased toward the government, and would not have provided testimony helpful to the defense.

A missing witness instruction is warranted if "the absent witness was peculiarly within the government's power to produce; and [if] the testimony would have elucidated issues in the case and would not merely have been cumulative." *United States v. Brock*, 417 F.3d 692, 699 (7th Cir. 2005) (citation and internal quotation omitted). As to the first element, a witness is peculiarly within a party's power to produce if he either: (1) is physically available only to that party; or (2) has such a relationship with one party as to effectively make him unavailable to the opposing party, regardless of actual physical availability. *Tavarez*, 626 F.3d at 905 (citing *United States v. Mahone*, 537 F.2d 922, 926 (7th Cir. 1976)). The latter prong is also referred to as "pragmatic unavailability." *See United States v. Christ*, 513 F.3d 762, 773 (7th Cir. 2008); *Yumich v. Cotter*, 452 F.2d 59, 64 (7th Cir. 1971) (finding that the employment by the city of uncalled police officers who witnessed an altercation between officers and the plaintiff, as well as the officers' "strong personal interest in the success of the city's defense of their conduct . . ." rendered them pragmatically unavailable to the plaintiff); *see also Mahone*, 537 F.2d at 926-27 (holding that an officer who was involved in the arrest

initiating case was pragmatically unavailable to the plaintiff because of his association with the United States in building its case, as well as his "interest in seeing his police work vindicated by a conviction of the defendant").

In this case, Garibay was unquestionably physically available to both parties. Villegas argues, however, that Garibay was pragmatically unavailable to the defense due to his status as a paid informant, his refusal to be interviewed, and the allegations he lodged against the defense. We have held that when a witness is physically available to both parties, the mere fact that the witness was a government informant does not inevitably establish that he was pragmatically available to testify only on behalf of the prosecution. *United States v. Rollins*, 862 F.2d 1282, 1298 (7th Cir. 1988) (citations omitted); *see also Tavarez*, 626 F.3d at 905 (stating that "a witness's status as a confidential informant does not necessarily give rise to a sufficient relationship with the government so as to render her unavailable to the defense"). Additionally, "[e]ven where a witness entirely refuses to discuss a case with the defense, a missing witness instruction may be appropriately denied." *United States v. Keplinger*, 776 F.2d 678, 702 (7th Cir. 1985); *see also United States v. Grizaffi*, 471 F.2d 69, 74 (7th Cir. 1972) (district court correctly refused to give missing witness instruction where unindicted co-conspirator refused to discuss the case with defense counsel, and defendant chose not to call witness because of uncertainty regarding his possible testimony).

The serious allegations made by Garibay that defense counsel improperly tried to influence his testimony, while a closer question, also did not render him pragmatically unavailable to the defendant. The "bias" or "prejudice" discussed in the case law is generally a product of the uncalled witness's status, usually as an employee of the party opposing the instruction, or is due to the witness having a personal stake in the conviction of the defendant. *See Yumich*, 452 F.2d at 64; *Mahone*, 537 F.2d at 926-27. Here, while Garibay had a personal stake in the *completion* of the trial, given that he was in custody under a material witness warrant and would not be released until after trial, he did not have a personal stake in any particular outcome, and was not in the type of employee relationship with the government that would render him biased in its favor. At the time of trial, Garibay was no longer a working informant, and no longer expected to receive an immigration benefit from his cooperation. Additionally, as the district court found, Garibay made statements that he was angry at the government for keeping him detained, cut off interviews with the federal authorities, and refused to continue working with them. Under such facts, we cannot find the bias required to reach the level of pragmatic unavailability.

The district court also found that Garibay's testimony would not have been "helpful" to Villegas, stating that Garibay's testimony could be "extremely harmful" to Villegas in that it could have "obliterate[d] your entrapment defense." We note that "helpful" in the context of whether a missing witness instruction is appropriate has

been found to mean "relevant" and "non-duplicative," *United States v. Cochran*, 955 F.2d 1116, 1123 (7th Cir. 1992). However, other courts have noted that where the defense seeks the "dual benefit of avoiding . . . potentially harmful testimony at trial, while at the same time obtaining the advantage of a negative inference drawn by the jury about the government's failure to produce . . . [the] witness . . . the trial court [is] under no obligation to grant the motion for a 'missing witness' instruction." *United States v. Spinosa*, 982 F.2d 620, 633 (1st Cir. 1992); *see also United States v. Torres*, 845 F.2d 1165, 1170 (2d Cir. 1988) (stating that "courts have been reluctant to find a witness practically unavailable when it appears that the defense has no real interest in calling the witness to the stand, but merely is engaged in a form of games-manship in an effort to obtain a missing witness charge") (citing *United States v. Bramble*, 680 F.2d 590, 592 (9th Cir. 1982)). Here, the district court did attribute the defendant's lack of willingness to call Garibay to "strat-egy," and we do not find the resulting denial of the instruction to be an abuse of discretion.

The government notes that the district court did not prevent the defense from raising the fact that the gov-ernment did not call Garibay in its closing argument, and defense counsel made numerous references to his absence. We have found that when a party is able to make such an argument, the refusal to grant the instruc-tion is not reversible error. *See Yumich*, 452 F.2d at 64; *United States v. Valles*, 41 F.3d 355, 360 (7th Cir. 1994) ("Nor, given that defense counsel was permitted to argue the inferences in closing, do these assertions [of error in

declining the missing witness instruction] substantiate a claim that Valle's rights were prejudiced."). Other courts have held that where a trial court allows counsel to argue the inference, showing an abuse of discretion for failure to give a missing witness charge is more difficult. *See, e.g., Torres*, 845 F.2d at 1171 (noting that where a trial court allows counsel to argue the inference, reversal for failure to give missing witness charge is "even more suspect"). At oral argument, Villegas argued that if a criminal defendant had to rely solely on his argument during closing that the government failed to call a witness (without the benefit of an instruction), the government would simply argue in return that the defense itself has the power to call and summon witnesses. That is exactly what the government in this case did ("Well, ladies and gentlemen, what the defendant didn't tell you is that he has the same exact subpoena power to bring any witness that he wants into this courtroom just like the Government does."). We have found that where the defendant himself has broached the subject of a missing witness by asking the jury to penalize the government for its failure to produce the witness, a prosecutor's argument to the effect that the defendant has the opportunity to call witnesses is proper. *United States v. King*, 150 F.3d 644, 649 (7th Cir. 1998); *United States v. Sblendorio*, 830 F.2d 1382, 1393 (7th Cir. 1987) (finding that the prosecutor's observation that the defense could produce a certain witness or witnesses if it wished neither alters the burden of proof nor penalizes the exercise of a constitutional right, rather, the argument merely conveys information that "[t]he jury is entitled to know"). In reality,

then, the government's argument that the defendant could have called the missing witness effectively nullifies any benefit that the defendant obtains from raising a missing witness issue before the jury. While this is proper, relying on the defendant's ability to argue that a witness was missing to find no prejudice may not, in fact, be warranted, given that the defendant in these circumstances does not, in essence, gain any benefit from arguing the inference. However, because we do not rely in any way on the defendant's closing argument in this case, we need not address the effect of *King* and *Sblendorio* on the question of whether a defendant's opportunity to argue the missing witness inference in its closing results in a finding of no prejudice.

Accordingly, we find that the district court did not abuse its discretion in denying the missing witness instruction.

## C.  Admission of Conversations and Prior Conviction

Villegas argues that the trial court erred when it ruled that the defense had opened the door to the government's introduction of a prior conviction, statements about Villegas's alleged drug dealing, and recorded conversations regarding other alleged crimes. We review a district court's evidentiary rulings for an abuse of discretion, *United States v. Avila*, 557 F.3d 809, 819 (7th Cir. 2009), and will reverse only if we discover an error that had a "substantial and injurious effect or influence on the determination of the jury." *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005).

When a party opens the door to evidence that would be otherwise inadmissible, that party cannot complain on appeal about the admission of that evidence. *United States v. Gilbertson*, 435 F.3d 790, 797 (7th Cir. 2006); *see also United States v. Martinez*, 988 F.2d 685, 702 (7th Cir. 1993). The district court is within its discretion in allowing the testimony if the objecting party has already opened the door for such testimony. *United States v. Anifowoshe*, 307 F.3d 643, 649 (7th Cir. 2002); *see also United States v. Touloumis*, 771 F.2d 235, 241 (7th Cir. 1985) ("This circuit has held on numerous occasions that when a party questions a witness on a subject, even though that subject may not be strictly relevant to the case, the party cannot complain on appeal if the opposing party subsequently introduces evidence on the same subject."). However, "[w]here the rebuttal evidence does not directly contradict the evidence previously received, or goes beyond the necessity of removing prejudice in the interest of fairness, it is within the district court's discretion to deny its admittance." *Martinez,* 988 F.2d at 702. Indeed, the "open door" doctrine's soundness depends on the specific situation in which it is used and thus calls for an exercise of judicial discretion. 21 C. Wright & K. Graham, Federal Practice and Procedure § 5039, p. 199 (1977); *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 177 (1988) (Rehnquist, J., dissenting).

Villegas argues that the district court erred when it allowed: (1) the government to inquire into Villegas's 2004 conviction for financial identity theft; (2) Special Agent Burke to testify that Garibay had told Burke that he knew Villegas to be a drug dealer; and (3) admitted

into evidence the April 2, 2007 unredacted conversation between Villegas and Garibay which contained discussions about alleged criminal activity, including drugs. Villegas argues that the defense did not open the door to such evidence on cross-examination.

The defense specifically inquired into what Special Agent Burke knew about Villegas at the early stages of the investigation, ("Is the background of the potential defendant, the target of this investigation of this attempted robbery, is that important to you, when you're approached by Mr. Garibay, the Government informant?"), and what he knew about the true nature of the relationship between Villegas and Garibay, ("Did you check out where the two of them met?"). Additionally, the defense implied that Villegas was simply a law-abiding and unwitting client of Garibay's, asking, "[n]ow, did it dawn on you that it might be strange that Ozzie Villegas, the client in this mortgage deal, would be calling his mortgage broker to rob an armored car?" The defense inquired into the number of phone calls made between Villegas and Garibay, and suggested that through these numerous calls, Garibay "pushed" Villegas to attend meetings and take part in the offense. The defense also specifically asked if Special Agent Burke elicited information from Garibay at the February 23, 2007 meeting regarding the extent of their mortgage broker-client relationship. During this meeting with the FBI, Garibay told Special Agent Burke that he knew Villegas to be a drug dealer who dealt a kilogram of cocaine a month. However, this information was not initially available to the jury because the government avoided asking

Special Agent Burke about what Garibay told him regarding Villegas's alleged drug dealing.

As the record shows, the cross-examination related specifically to what was initially left out of the trial—namely, what Special Agent Burke really knew about Villegas's background, and the true nature of the relationship between Villegas and Garibay at the time of the initial investigation. Given that the jury was left with an incomplete picture of the course of the early investigation and the extent to which Garibay and Villegas's relationship went beyond a client-broker one, the court did not abuse its discretion in allowing the government to inquire about the agent's knowledge of Villegas's criminal history (including the financial identity theft conviction), or to inquire about what Garibay told the agent regarding Villegas's alleged drug dealing.

Additionally, with respect to the prior conviction, the trial court specifically instructed the jury that Villegas's 2004 conviction could be used solely for determining what Burke knew at the time that he began his investigation "and for no other purpose." This court has generally held that "where a limiting instruction is given . . . the error usually will be harmless." *United States v. Rogers*, 542 F.3d 197, 201 (7th Cir. 2008). *But see Jones v. Basinger*, 635 F.3d 1030, 1055 (7th Cir. 2011) (finding that even repeated instructions cannot render harmless "serious" prejudicial error); *United States v. Ochoa-Zarate*, 540 F.3d 613, 620 (7th Cir. 2008) (stating that the presumption that a jury will follow instructions is overcome when there is an "overwhelming probability" that the

jury was unable to follow that instruction). In this case, there is no reason to believe that the jury was unable to follow the proper instruction, or any indication that the prior conviction amounted to "serious" prejudicial error, so the district court did not abuse its discretion.

The admission of the unredacted April 2, 2007 conversation between Villegas and Garibay in which the two discuss other alleged criminal activities is a closer question. The district court found this conversation admissible because the acts discussed during the conversations were "inextricably intertwined" with the charged offense as they completed the picture of Garibay and Villegas's interactions. We have, however, more recently held that "resort to inextricable intertwinement is unavailable when determining a theory of admissibility." *United States v. Gorman*, 613 F.3d 711, 719 (7th Cir. 2010).

Before admitting the conversation, the court decided to allow Villegas's entrapment defense based on the defense's earlier request and the nature of the cross-examination of Special Agent Burke. Alternatively, the court allowed the April 2nd conversation as evidence of predisposition and whether Villegas was coerced by Garibay. After the conversation was read into evidence, the court instructed the jury that the evidence in the recordings relating to acts other than those charged could be considered "only on the question of the relationship between [Garibay] and the defendant and on an issue of entrapment."

Villegas argues that he did not open the door to these later conversations because he only inquired into the

nature of the relationship at the time the investigation began and that the alleged acts were not "inextricably intertwined." However, the court specifically admitted the evidence on the issue of entrapment as well, a defense that Villegas initially sought. Where a defendant offers a defense of entrapment, the government must prove either that it did not induce the defendant to commit the crime, or that the defendant had a predisposition to commit the crime. *United States v. Lewis*, 641 F.3d 773, 781 (7th Cir. 2011) (citing *United States v. Akinsanya*, 53 F.3d 852, 858 (7th Cir. 1995)). The April 2nd conversation showed a willingness to discuss criminal activity that was relevant to rebutting the level of inducement claimed by Villegas. While the district court did not specifically state that it was admitting the conversation to allow the government to rebut the inducement argument, it did state that the conversation was relevant to the earlier phone conversations between Villegas and Garibay which the defense painted as one involving "pushing."[2] Villegas also argues that the drug crimes

---

[2] Villegas does not argue that the prior alleged drug acts were not similar enough to the charged conduct or close enough in time to be admissible, and we therefore take no position on whether the crimes should have been admitted for that specific purpose. *See United States v. Swiatek*, 819 F.2d 721, 727-28 (7th Cir. 1987) (finding that when a defendant employs an entrapment defense, evidence of prior bad acts is admissible to prove predisposition "because in such a case the defendant's predisposition to commit the charged crime is legitimately (continued...)

discussed in the April 2nd conversation are unduly prejudicial, but we do not find that the prejudice outweighs the probative value as to the level of inducement involved between Garibay and Villegas.

Therefore, the district court did not abuse its discretion in admitting evidence of Villegas's prior felony conviction and his alleged drug activity.

## D. The Five-Level Sentencing Enhancement

Villegas next objects to the application of a five-level enhancement under U.S.S.G. § 2B3.1(b)(2)(C), which requires district courts to increase a defendant's offense level by five points "if a firearm was brandished or possessed." Specifically, he challenges the finding that he "possessed" a firearm such that the enhancement should be included in the calculation of the guideline sentence. We review a district court's application of the sentencing guidelines de novo and its findings of fact for clear error. *United States v. Samuels*, 521 F.3d 804, 815 (7th Cir. 2008). A judge commits a procedural error at sentencing if she calculates the guidelines incorrectly, treats the guidelines as mandatory, fails to consider the

---

(...continued)

at issue", but that to be admissible, the evidence must show an act that is similar enough and close enough in time to be relevant to the matter at issue, and its probative value must not be substantially outweighed by the danger of unfair prejudice).

18 U.S.C. § 3553(a) factors, or inadequately explains the chosen sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007). The government bears the burden of proving by a preponderance of the evidence that a sentencing enhancement such as the one at issue applies. *United States v. Womack*, 496 F.3d 791, 797 (7th Cir. 2007).

In applying the enhancement, the district court relied in part on *United States v. Bolden*, 132 F.3d 1353 (10th Cir. 1997). In *Bolden*, the defendant planned a robbery of a bank with a confidential informant. The two had agreed that the informant would obtain a firearm, and the informant obtained a weapon from law enforcement. On the day of the planned robbery, the defendant and the informant arrived at the bank. The informant left the car with the firearm and walked towards the bank, at which point the defendant was arrested. *Id*. at 1355. The Tenth Circuit upheld the application of a firearm enhancement, finding that "the government was . . . not required to prove that the firearm was actually '. . . possessed' during the robbery, but only that it was Bolden's intent that such conduct would take place." *Id*. at 1356. The court also rejected Bolden's argument that the possession of the firearm by the informant could not be attributed to him as relevant conduct.

However, in *Bolden*, the base offense level was calculated under section 2X1.1 of the Guidelines, which covers attempt, solicitation, and conspiracy not covered by a specific offense guideline, and which specifically includes an adjustment for "any intended offense conduct that can be established with reasonable cer-

tainty." *See* U.S.S.G. § 2X1.1 (1997). Here, Villegas's base offense level and adjustments were calculated under section 2B3.1, which does not contain the same language. While we have not specifically resolved this issue, several of our sister circuits have found that where a statute prohibits both completed robberies and attempts, U.S.S.G. § 2X1.1 is not involved and the court only looks to the general guideline. *See United States v. Van Boom*, 961 F.2d 145, 146-47 (9th Cir. 1992); *United States v. Williams*, 891 F.2d 962, 965 (1st Cir. 1989); *United States v. Toles*, 867 F.2d 222, 223 (5th Cir. 1989). In this case, 18 U.S.C. § 1951 proscribes both the completed act as well as attempts. *See* 18 U.S.C. § 1951(a) ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or *attempts* or conspires so to do . . . .") (emphasis added). We need not resolve or even address this issue because neither party asserts that section 2X1.1 applies, nor did the pre-sentence report or the court reference section 2X1.1 in calculating the applicable guidelines. However, we note that the "any intended offense conduct" language used in section 2X1.1 has no place here, nor does the Tenth Circuit's decision in *Bolden*.

The district court also relied in part on *United States v. Wallace*, 212 F.3d 1000 (7th Cir. 2000). In that case, Wallace and his brother decided to rob a bank. Before the robbery, the defendant's brother said he would "take care of" the bank security guard, and Wallace testified that he knew his brother owned a gun. *Id.* at 1002. Wallace's brother did, in fact, brandish the gun and point it at tellers and guards while the defendant was collecting

money. *Id.* The defendant later denied knowing that his brother carried the gun into the bank or used the gun during the commission of the robbery. *Id.* We found a six-point enhancement for the "use" of a firearm appropriate where Wallace had pled to aiding and abetting armed bank robbery, and where there was "more than sufficient evidence at trial to show that [Wallace] knew his brother either planned to carry a gun or that he actually used a gun during the robbery." *Id.* at 1005. In *Wallace*, however, not only was Wallace found guilty of armed bank robbery, but a gun was actually "used" during the attempted commission of the offense.

We find that the language of the guidelines supports the five-level enhancement in this case. Section 1B1.3(a)(1)(B) of the Sentencing Guidelines clarifies the type of conduct that is relevant to determine the offense level under Chapter Two. It provides that a court may consider, "in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable *acts and omissions* of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, *in preparation for that offense*, or in the course of attempting to avoid detection or responsibility for that offense . . . ." U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added). Thus, Villegas is liable for the "reasonably foreseeable acts and omissions" of Garibay, the informant, that occurred "in preparation" for the offense.

In this case, Villegas on two occasions claimed that his "friend" in the armored vehicle would just hand over the money; however, Garibay specifically stated to

Villegas that "if the guy tries to pull one out, then I do. . . . I'm going to have to shoot him." On the night before the attempted robbery, when Garibay showed Villegas the gun and bulletproof vest, Villegas asked "[d]oes it work and everything," and inquired as to whether Garibay was planning to wear the vest. There was also testimony at trial that law enforcement placed the gun in Garibay's car the morning of the attempted offense. So Garibay "possessed" the gun "in preparation" for the attempted offense, and this possession was reasonably foreseeable to Villegas. It does not matter that Villegas himself never possessed the weapon.

We note, however, that there may be cases where reliance on the "in preparation of" language of U.S.S.G. § 1B1.3(a)(1)(B) would result in too broad an application of the sentencing enhancement in attempt cases where the robbery is thwarted, especially where the time between that preparation and the attempted offense is significant. Additionally, if, for example, an accomplice discussed and showed a gun to a defendant some time before the attempted offense, but did not actually bring that gun when the attempt is carried out, a sentencing court would have to consider whether the later absence of a gun could negate the previous "possession" relied upon for the enhancement. *See* U.S.S.G. § 1B1.3(a)(1)(B). In this case, however, Villegas does not challenge Garibay's possession; he only argues that Villegas himself never possessed the weapon, and never argued, nor could he, that the gun was not present on the day of the attempted robbery. We therefore find that the enhancement under U.S.S.G. § 2B3.1(b)(2)(C) was applicable.

We also reject Villegas's claim of "sentencing entrapment," which occurs when an individual predisposed to commit a lesser crime commits a more serious offense as a result of "unrelenting government persistence." *See United States v. Hale,* 448 F.3d 971, 988 (7th Cir. 2006) (citing *United States v. Gutierrez-Herrera*, 293 F.3d 373, 377 (7th Cir. 2002); *United States v. Estrada*, 256 F.3d 466, 473-74 (7th Cir. 2001). We find that the facts show that Villegas had the willingness to violate the law with the possession of a gun "without extraordinary inducements." *Estrada*, 256 F.3d at 475.

## III. CONCLUSION

For the foregoing reasons, Villegas's conviction and sentence are AFFIRMED.